# LA BOURGOGNE.[1]

ON WRIT AND CROSS WRIT OF CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 33. Argued November 1, 1907.—Decided May 18, 1908.

The decree of the District Court in a proceeding for limitation of liability adjudging that the petitioner is entitled to the limitation and declaring that one class of claims cannot be proved against the fund and remitting all questions concerning other claims for proof prior to final decree is interlocutory and an appeal to the Circuit Court does not lie therefrom, but from the subsequent decree adjudicating all the claims filed against the fund.

This court will not disturb the concurrent findings of fact of both the courts below unless so unwarranted by the evidence as to be clearly erroneous, and a finding that the rate of speed of a vessel on the high seas during a fog was immoderate under the international rules, will not be disturbed because based on the conceptions of immoderate speed prevailing in the United States courts and not on those prevailing in the courts of the country to which the vessel belonged.

In a proceeding to limit liability instituted by the owners of a foreign vessel lost on the high seas the right to exemption must be determined by the law as administered in the courts of the United States.

In a proceeding for limitation of liability the remedy of claimants against the fund for the failure of the petitioners to produce log books ordered

---

[1] Docket title, No. 33, George Deslions, W. C. Perry, Administrator of Kate M. Perry *et al.*, Petitioners, *v.* La Compagnie Générale Transatlantique, Owner of the Steamship La Bourgogne.

to be produced by the court is to offer secondary evidence or ask for dismissal of the proceeding; they cannot proceed and ask the court to decide the case, not according to the proof but on presumption of wrong-doing and suppression of evidence.

Under the circumstances of this case the fault of the officers and crew of the steamship La Bourgogne resulting in collision and loss of the vessel and its passengers, crew and cargo was not committed with the fault and privity of its owner, so as to deprive it of the right to a limitation of liability under §§ 4282, 4289, Rev. Stat.

Mere negligence of the officers and crew of a vessel, pure and simple and of itself, does not necessarily establish the existence on the part of the owner of the vessel of privity and knowledge within the meaning of the limited liability act of 1851 as reënacted in §§ 4282–4287, Rev. Stat. *The Main*, 152 U. S. 122, distinguished.

Under § 4405, Rev. Stat., the regulations of the supervising inspectors and the supervising inspector general when approved by the Secretary of the Treasury in regard to carrying out the provisions of §§ 4488, 4489, Rev. Stat., have the force of law, and the owner of a foreign vessel is required to comply therewith by the act of August 7, 1882, c. 441, 22 Stat. 346, and, even if such regulations are inconsistent with the statute, compliance therewith does not amount to a violation of the statute and deprive the owner of the right to a limitation of liability on account of privity with the negligence causing the loss.

In the case of a foreign vessel making regular trans-oceanic trips the freight for the voyage to be surrendered by the owner in a proceeding for limitation of liability when the vessel is lost on the return trip is that for the distinct sailing between the regular termini and does not include the freight earned on the outward trip.

Notwithstanding that where a contract of transportation is unperformed and no freight is earned no freight is to be surrendered, such freight and passage money as are received under absolute agreement that they shall be retained by the carrier in any event must be surrendered by the owner of a vessel seeking to limit his liability under the provisions of §§ 4283–4287, Rev. Stat.

An annual subsidy contract made by a foreign government and a steamship company for carrying the mails was held under its conditions not to be divisible, and no part thereof constituted freight for the particular voyage on which the vessel was lost which should be surrendered by the owner in a proceeding for limitation of liability.

Where the law of the State to which a vessel belongs gives a right of action for wrongful death occurring on such vessel while on the high seas, such right of action is enforceable in the admiralty courts of the United States against the fund arising in a proceeding to limit liability, *The Hamilton*, 207 U. S. 398; and the law of France does give such right of action for wrongful death.

In determining whether claims for wrongful death are enforceable against the fund in a limited liability proceeding, notwithstanding the right to

enforce such claims is based on the right of action given by the law of the country to which the vessel belongs, the question of whether the vessel was in fault and the fund liable must be determined by the law of the United States courts. The duty to enforce the cause of action given by the foreign law does not carry with it the obligation to give the proof the same effect as it would have in the courts of that country if the effect is different from that which such proof would have in the courts of the United States.

Where there is an honest controversy as to what the pending freight for the voyage includes, and in the absence of contumacious conduct, a limitation of liability should not be refused because the petitioner has not, pending the determination of such controversy, actually paid over to the trustee the entire amount of the pending freight as finally adjudicated.

Where on writ and cross writ of certiorari the judgment is affirmed neither party prevails and each must pay his own costs in this court.

144 Fed. Rep. 781, affirmed.

THE facts are stated in the opinion.

*Mr. J. Parker Kirlin,* with whom *Mr. Robert D. Benedict, Mr. Edward G. Benedict* and *Mr. A. Gordon Murray* were on the brief, for petitioners for writ of certiorari:

The statute under which the limitation of liability is asked being in derogation of the rights which the claimants would otherwise have under the common law, should therefore be strictly construed. *The Main,* 152 U. S. 122, and cases there cited.

The allegation that the loss occurred without the privity or knowledge of the petitioner must be affirmatively proved. It cannot be established without proving the negative of any matter of privity or knowledge that is put in issue. The petitioner must prove not only the ultimate fact, but also such subsidiary facts as may be necessary to found the conclusion that is to be established.

The Court of Appeals, in ruling that there could not be any direct privity on the part of the petitioner because none of its officers was on board the vessel, places too narrow a construction on the word privity. The petitioner would be in privity with the cause of damage, if it encouraged, consented to or connived at the kind of navigation that led to the disaster.

*Craig* v. *Continental Ins. Co.*, 141 U. S. 638; *Butler* v. *Steamship Co.*, 130 U. S. 527, 553; *The Rio Janiero*, 130 Fed. Rep. 76; *S. C.*, 195 U. S. 632; *Parsons* v. *Empire Trans. Co.*, 111 Fed. Rep. 202, 208; *S. C.*, 183 U. S. 699; *McGill* v. *Mich. S. S. Co.*, 144 Fed. Rep. 788; *S. C.*, 203 U. S. 593; *Quinlan* v. *Pew*, 56 Fed. Rep. 111.

In order to obtain the limitation provided for by statute the petitioner has the burden of proof, and is bound to show, by a fair preponderance of the evidence, that the loss in respect of which the limitation is desired, has been "done, occasioned, or incurred without the privity or knowledge of such owner." Unless it has established that condition affirmatively, it cannot have a limitation of its liability. *Quinlan* v. *Pew*, 56 Fed. Rep. 111, 118; *The Colima*, 82 Fed. Rep. 665, 669; *McGill* v. *Mich. S. S. Co.*, 144 Fed. Rep. 788, and cases cited; *The Wildcroft*, 201 U. S. 378.

That the petitioner encouraged, sanctioned and knowingly tolerated, and was thus in privity with the kind of navigation that resulted in the loss of the Bourgogne is shown by circumstances which are not in substantial dispute. The facts show that the Bourgogne was lost and the damages suffered by the claimants were occasioned by the negligent act of the petitioner's servants in running the steamer at an immoderate rate of speed in a dense fog, and further that petitioner did not issue and enforce sufficient instructions to its captains to run its steamers at moderate speed in fog. Hence petitioner should be held to be in privity with the improper navigation of the Bourgogne, if such navigation could have been prevented by the petitioner by the promulgation and enforcement of reasonable rules for navigation under such circumstances. *Doing* v. *N. Y., Ontario & Western Ry.*, 151 N. Y. 579, 583; *Abel* v. *Delaware & Hudson Canal Co.*, 103 N. Y. 585; *Whittaker* v. *Del. & Hudson Canal Co.*, 126 N. Y. 549; *Cooper* v. *Iowa Central Ry.*, 45 Iowa, 134; *Chicago &c. Ry Co.* v. *Taylor*, 60 Illinois, 461; *Thomas* v. *Cincinnati &c. Ry.*, 97 Fed. Rep. 251; *Northern Pacific Ry.* v. *Nickels*, 50 Fed. Rep. 718.

Knowledge of the practice of its steamers to run at immoderate speed in fog may fairly be imputed to the petitioner from its experience in previous cases of collision of its own steamers. *Thorbjorsen* v. *Compagnie Générale Transatlantique*, Record p. 1171; aff'd, Court of Appeals of Rouen, Record p. 1179; *The Normandie and the Charlotte Webb*, 58 Fed. Rep. 427. Knowledge of the custom may, under the authorities, be inferred from such circumstances. *The George W. Roby*, 111 Fed. Rep. 601; *District of Columbia* v. *Armes*, 107 U. S. 519; *Chicago* v. *Powers*, 42 Illinois, 169; *Quinlan* v. *City of Utica*, 11 Hun, 217; *S. C.*, 74 N. Y. 603; *Carpenter* v. *Boston &c. R. R.*, 97 N. Y. 949; *Snow* v. *Fitchburg R. R. Co.*, 136 Massachusetts, 522; *Galloway* v. *Chic. &c. R. R.*, 56 Minnesota, 346.

The disobedience of the order of the court requiring the production of the log books of the Bourgogne and of other steamers navigated by Captain Deloncle, for two years prior to the collision, creates a presumption adverse to the petitioner which corroborates the claimants' proof that the petitioner's steamers were habitually run at immoderate speed in fog. *Blatch* v. *Archer*, Cowp. 63; 1 Starkie on Evidence, p. 54; *Commonwealth* v. *Webster*, 5 Cushing, 295, 316; *McDonough* v. *O'Niel*, 113 Massachusetts, 92; *People* v. *McWhorter*, 4 Barb. 438; *Railway Co.* v. *Ellis*, 54 Fed. Rep. 481; *Clifton* v. *United States*, 4 Howard, 242; *Kirby* v. *Tallmage*, 160 U. S. 379, 383; *The New York*, 175 U. S. 187, 204; *Wylde* v. *Northern R. R. Co. &c.*, 53 N. Y. 156; *A Quantity of Distilled Spirits*, 3 Benedict, 70.

The petitioner was operating the Bourgogne in violation of § 4488 of the Revised Statutes, which required her to have such numbers of life boats and life rafts as would best secure the safety of all persons on board in case of disaster. She carried 714 persons but had boat and raft capacity for only 658.

The reasonable construction of § 4488, is that a foreign steamship carrying passengers from a port in the United States,

must be provided with such number of life-boats and life-rafts as will float all the persons on board in case the ship sinks. If every boat and life-raft that the Bourgogne carried had been successfully launched and fully laden with the passengers and the crew, fifty-six or fifty-eight persons would necessarily have been left to sink with the ship. It seems too plain for argument that under those circumstances she was not fitted with such number of boats and rafts as would best secure the safety of all persons on board as the law required.

The freight for the voyage was never transferred to the trustee, nor was any bond for it given. The court below erred in granting the petitioner a limitation of its liability without having secured possession of the fund to which it assumed to limit the rights of the claimants. *In re Morrison*, 147 U. S. 35; *Norwich* v. *Wright*, 13 Wall. 104, 124; *Ex parte Slayton*, 105 U. S. 451, 452; *O'Brien* v. *Miller*, 168 U. S. 287.

The voyage of the Bourgogne on which she was sunk was a round voyage from Havre, her home port, out to New York and back to Havre, and the "freight for the voyage," within the meaning of the limitation of liability acts, is all the freight received for the whole round voyage, and not merely the freight for the half voyage, or passage back from New York to Havre. Parsons on Shipping and Admiralty, p. 307; *In re George Moncan*, 8 Sawyer, 353; *Friend* v. *Gloucester Insurance Co.*, 113 Massachusetts, 326, 332; *Whitcomb* v. *Emerson*, 50 Fed. Rep. 128; *The Giles Loring*, 48 Fed. Rep. 463; *Williamson* v. *London Assurance Co.*, 1 M. & S. 318; *S. C.*, 14 R. R. 441; *The Progress*, Edward's Admiralty Reports, 210, 218; *Moran* v. *Jones*, 7 E. & B. 523; *The Brig Mary*, 1 Sprague, 17.

The court below erred in holding that the proportion of the annual mail subsidy paid by the French government to the petitioner for the operation of the mail service in respect of the voyage on which the Bourgogne was lost was not "freight," and need not be accounted for in this proceeding. *The Main*, 152 U. S. 122, 129; *O'Brien* v. *Miller*, 168 U. S. 287, 304; Kent's Commentaries (7th ed.), Vol. III, p. 279.

*Mr. Edward K. Jones* and *Mr. William G. Choate*, with whom *Mr. Joseph P. Nolan* was on the brief, for respondent, La Compagnie Générale Transatlantique and petitioners on cross writ:

The decree of Judge Townsend of March 22, 1902, was a final decree.

(1) So far as it determined that the petitioner should be granted a decree limiting its liability, and (2) that claims for loss of life were disallowed and not to be brought before the commissioner for consideration, and (3) that each of the three specified items of prepaid passage money, prepaid freight and an aliquot part of the French subsidy were not pending freight; and (4) as the appeal was not taken by the claimants within the statutory period of six months after the entering of Judge Townsend's decree, the Circuit Court of Appeals had no jurisdiction to hear the appeal in respect to these questions, or either of them. 26 St., p. 826, c. 517; *Ray* v. *Law,* 3 Cranch, 179; *Forgay* v. *Conrad,* 6 How. 201; *Thompson* v. *Dean,* 7 Wall. 342; *St. Louis, I. M. & S. R. R. Co.* v. *Southern Exp. Co.,* 108 U. S. 24, at 29; *Bronson* v. *Railroad Co.,* 2 Black, 524; *Bank* v. *Shedd,* 121 U. S. 74, 84, 85; *Hill* v. *Chicago & Evanston R. R. Co.,* 140 U. S. 52; *Winthrop Iron Co.* v. *Meeker,* 109 U. S. 180; *Lewisburg Bank* v. *Sheffey,* 140 U. S. 445.

A decree sustaining the petition for a limitation of liability has always been considered and treated as a final decree for the purposes of an appeal, irrespective of any further proceedings which may be necessary to distribute the fund. *The Annie Faxon,* 66 Fed. Rep. 575; *S. C.,* 75 Fed. Rep. 312; *Parsons* v. *Empire Transportation Co.,* 111 Fed. Rep. 202; *Gleason* v. *Duffy,* 116 Fed. Rep. 298; *Butler* v. *Boston Steamship Co.,* 130 U. S. 527, 550.

The District Court and the Circuit Court of Appeals correctly decided on the proofs made that the petitioner should be granted the limitation of liability provided by § 4283 of the Revised Statutes.

The purpose of the act has been many times explained by

this court to have been the encouragement of shipbuilding and of investment in ships, and the intent being plain, the act should be liberally construed to accomplish the purpose aimed at. *Moore* v. *American Transportation Co.,* 24 How. 1; *Norwich Co.* v. *Wright,* 13 Wall. 104; *The Benefactor,* 103 U. S. 239; *The Scotland,* 105 U. S. 24, 33; *The Northern Star,* 106 U. S. 17; *Providence & N. Y. Steamship Co.* v. *Hill Mfg. Co.,* 109 U. S. 578; *The City of Norwich,* 118 U. S. 468; *Butler* v. *Boston S. S. Co.,* 130 U. S. 527. The case of *The Main,* 152 U. S. 122, discussed and distinguished.

To establish that the loss or injuries were caused with the knowledge or privity of the owners, the knowledge must be shown to be actual and not merely constructive. *Quinlan* v. *Pew,* 56 Fed. Rep. 111, 117; *Providence & N. Y. S. S. Co.* v. *Hill Mfg. Co.,* 109 U. S. 578.

The points relied upon to show that this collision happened with the knowledge or privity of the petitioner or that it should not be granted limitation of its liability, are not sustained by the evidence.

Even if it were shown that the captains of this line, to the knowledge of the petitioner, navigated their ships in fog at a speed in excess of that recognized by this country as moderate, but within the limit of speed recognized by the French law as moderate, the petitioner's right to a limitation of its liability would not be thereby impaired or forfeited. A person who embarks himself or his goods on a French ship, certainly casts in his lot for certain purposes with the ship on which he embarks. To a certain extent, at least, he voluntarily submits himself to the French law. The petitioner ought to be judged by the law of France, to which the other party to the controversy appeals. *Regina* v. *Anderson,* L. R. 1 Cr. Cas. Revd. 161.

The finding of the district judge that the petitioner was entitled to a limitation of liability, concurred in by the Circuit Court of Appeals, will not, under the rulings of this court, be disturbed, inasmuch as the same involves essentially a question of fact. *Compania La Flecha* v. *Braver,* 168 U. S. 104;

*Stuart* v. *Hayden*, 169 U. S. 1; *Baker* v. *Cummings*, 169 U. S. 189; *The Carib Prince*, 170 U. S. 655; *Morewood* v. *Enequist*, 23 How. 491; *The Conqueror*, 166 U. S. 110, 136; *Illinois* v. *Illinois Central R. R. Co.*, 184 U. S. 77; *Towson* v. *Moore*, 173 U. S. 17, 24.

The amount received by the petitioner from the French government, as a subsidy, is not pending freight, and the petitioner was not required to surrender the same to the trustee.

The petitioner was not required to surrender to the trustee the freight and passage money received by it for the passage from Havre to New York. *The Alpena*, 8 Fed. Rep. 280; *Gokey* v. *Fort*, 44 Fed. Rep. 364; *The Rose Culkin*, 52 Fed. Rep. 328; *The U. S. Grant*, 45 Fed. Rep. 642; *The Doris Eckholf*, 30 Fed. Rep. 140.

MR. JUSTICE WHITE delivered the opinion of the court.

On July 4, 1898, in the Atlantic Ocean, about sixty miles off Sable Island, as the result of a collision between the British ship Cromartyshire and the French steamship La Bourgogne, bound from New York to Havre, La Bourgogne was hopelessly injured, sank in a short time, and most of her passengers, her captain, other principal officers, and many of the crew went down with the ship. Numerous suits in admiralty and actions at law were brought in various Federal and state courts against La Bourgogne, or her owners, to recover damages for loss of life, loss of baggage, and other personal effects. These claims aggregated a very large sum. In May, 1900, La Compagnie Générale Transatlantique, a French corporation, the owner of La Bourgogne, petitioned the United States District Court for the Southern District of New York seeking to obtain the benefit of the laws of the United States limiting the liability of ship owners. It was averred that the collision was caused solely by the fault of the Cromartyshire, but even if there was fault on the part of La Bourgogne it was without the privity or knowledge of the company. The interest of

the company in the steamship and her pending freight was alleged to be only about one hundred dollars, the value of articles saved from the wreck. A list of the pending suits was annexed. It was prayed that a trustee be appointed, to whom the interest of the company in the steamship and her pending freight might be transferred. A monition warning all persons having claims by reason of the collision to prove the same, within a time to be fixed, was asked, as also that a commissioner be appointed to take such proof, and that the prosecution of all other actions because of the collision be restrained. Finally it was prayed that the company be decreed not to be liable for the loss of La Bourgogne, or, if responsible, its liability in conformity to the statute be limited to the property surrendered.

The court directed the company to transfer to a named trustee its interest in the steamship and her pending freight, and following this order a formal transfer was executed. There were, however, actually surrendered to the trustee only certain life-boats and life-rafts. A monition and a preliminary injunction were ordered, and a commissioner was named to take proof of claims within a time fixed. In conformity with a rule of the court relating to the procedure to limit liability, which is in the margin,[1] the commissioner in a short while

---

[1] Rule No. 78 of the District Court of the United States for the Southern District of New York:

"Proof of claims presented to the commissioner shall be made by or before the return day of the monition by affidavit specifying the nature, grounds and amount thereof, the particular dates on which the same accrued, and what, if any, credits were given thereon, and what payments, if any, have been made on account; with a bill of particulars giving the respective dates and amounts, if the same consists of several different items. Such proof shall be deemed sufficient, unless within five days after the return day of the monition, or after interlocutory decree in case of issue joined by answer to the petition, or within such further time as may be granted by the court, the allowance of the claim shall be objected to by the petitioner or by some other creditor filing a claim, who shall give notice in writing of such objection to the commissioner and to the proctors of the claim objected to, if any. Any claim so objected to must be established by further legal *prima facie* proof on notice to the objecting party, as in ordinary cases;

reported that claims aggregating more than two million dollars had been presented. Most were for losses occasioned by death and the others were for personal injuries and for loss of baggage or other personal effects.

Disregarding the technical attitude of the parties on this record we shall speak of La Compagnie Générale Transatlantique, owner of La Bourgogne, as the petitioner and the adverse parties as claimants.

Without stating details, it suffices to say that the petitioner challenged the validity and amount of the claims reported. The claimants traversed the petition for limitation of liability, charging that the collision had been solely caused by the fault of La Bourgogne in going at an immoderate rate of speed in a dense fog, and that such fault was with the privity and knowledge of the petitioner. This latter was based on averments that the petitioner had negligently failed to make and enforce adequate regulations to prevent its steamers being run at an immoderate speed in a fog, that it had knowledge that its steamers were habitually so run, and because La Bourgogne was not fully manned and equipped as required by law, had no watertight bulkheads, and was not furnished with boats or proper disengaging apparatus, as required by the laws of the United States. It was further charged that the petitioner was not entitled to a limitation of liability, because it had not actually surrendered the freight pending, and besides had not surrendered the sum of a subsidy given by the French government for carrying the mails and for other services.

Pending action upon the report the case proceeded as to the general questions of fault for the collision and the right to a limitation of liability. During the proceedings, in answer

---

but any creditor desiring to contest the same upon any specific defense must, with his notice of objection, or subsequently, if allowed by the commissioner or the court, state such defense, or be precluded from giving evidence thereof; and the unsuccessful party to such contest may be charged with the costs thereof. The commissioner shall, on the return day of the monition, file in open court a list of all claims presented to him."

to interrogatories propounded on behalf of certain of the claimants, the petitioner admitted that it had received the following sums:

From the French government for the carriage of mails, etc., between Havre and New York during the year 1898, being for fifty-two trips between Havre and New York, going and returning........ 5,473,400.00 francs

For passage money on the last trip from Havre to New York.................. 44,480.70 "

For freight collected on the same sailing... 14,088.95 "

For passage on the trip from New York to Havre, in which La Bourgogne was lost . 100,703.08 "

For freight on the same sailing.......... 12,716.43 "

The trustee named by the court thereupon demanded the actual surrender of one fifty-second part of the annual subsidy and all the freight and passage money above referred to. The petitioner refusing to comply, in April, 1901, the trustee and some of the claimants asked an order directing the payment of said amounts with interest from the date of the collision. On May 11, 1901, the court declined to make the order, and reserved the matter for further consideration.

In the autumn following, in October, 1901, the case came on for trial before Townsend, District Judge. After taking testimony in open court for several days an order was entered directing that any further testimony be taken out of court. This being done, the case in its then stage was heard. The court (Townsend, District Judge) expressed its opinion as to fault for the collision, as to whether an adequate surrender had been made of the interest of the petitioner in the steamship and her pending freight, as to whether the petitioner was entitled to a limitation of its liability, and as to whether claims resulting from loss of life were under any circumstances entitled to be established against the fund. No opinion was expressed as to the legal merit of or the amount of the other

claims against the fund. The conclusions of the court were thus by it summed up (117 Fed. Rep. 261):

"First, that the prayer for limitation should be granted; second, that claims for loss of life should be excluded from consideration in this proceeding; third, that the Bourgogne was to blame for the collision; fourth, that claims other than those for loss of life be referred to the commissioner 'to take testimony as to the amount of such claims and report the same to this court, together with his opinion, with all convenient speed;' fifth, that the petitioner has duly surrendered its interest in the Bourgogne and her pending freight by the transfer made to the trustee, and that the value of such interest extends no further than the value of the life-boats and life-rafts."

A decree was entered conformably to these views. A few weeks thereafter the court permitted the S. S. White Dental Company to file a claim for the value of certain merchandise shipped under a bill of lading alleged to be of the value of $17,108.40.

The commissioner heard testimony concerning the validity and the amount of the respective claims. On May 9, 1904, the commissioner filed his report. The claim of the S. S. White Dental Company was disallowed on the ground that La Bourgogne was in all respects seaworthy at the time of her sailing on the voyage on which she was lost, and that in consequence of the provisions of the Harter Act, the claim in question being for merchandise shipped as freight under a bill of lading, no recovery could be had. The remaining claims, noted in the margin,[1] were allowed upon the theory that recovery might be had as for baggage lost by the sinking of the steamship.

---

[1] To Pauline Henuy, as administratrix of Juliette Cicot, deceased, $2,802, for loss of money and personal effects.

To Henry Hyer Knowles, as administrator of Gertrude Lalla Rookh Knowles, deceased, $2,000, for loss of personal effects.

To William C. Perry, as administrator of Kate M. Perry, deceased, $5,277.50, for loss of money and personal effects.

To William C. Perry, as administrator of Florence Perry, deceased, $1,050, for loss of money and personal effects.

In thus deciding the commissioner followed the ruling of the Circuit Court of Appeals for the Second Circuit made in *The Kensington*, 94 Fed. Rep. 885, in which it was held that the exemption from liability conferred by the Harter Act did not embrace baggage when not shipped as cargo. Obviously, also, the commissioner was of the opinion, for like reasons, that Rev. Stat., § 4281—exempting a master and the owner of a vessel from liability for the value of precious metals, jewelry, etc., unless written notice of the character of such articles be given and the same be entered on a bill of lading—was also inapplicable. The petitioner excepted to so much of the report as allowed the claims, and the S. S. White Dental Company excepted to the disallowance of its claim. These exceptions were overruled, and the report was confirmed.

In July, 1904, a decree was signed by District Judge Thomas. It was adjudged that all claims favorably reported upon should be paid out of the fund, and conformably to this conclusion a specific decree in favor of each of the claimants was awarded, with interest from the date of the collision to the date of the decree. The adverse action of the commissioner upon the claim of the S. S. White Dental Company was affirmed. Giving effect to the previous ruling made by Judge Townsend it was adjudged "That all claims which have been filed in this proceeding on behalf of persons for damages for negligence resulting in loss of life caused by said collision be and the same are hereby disallowed and excluded from the consideration of the commissioner in this proceeding."

On the main issues—that is, the fault of La Bourgogne—

---

To William C. Perry, as administrator of Sadie Perry, deceased, $1,050, for loss of money and personal effects.

To John Perry, as next of kin of Katherine Perry and Albert Perry, deceased, $350, for loss of personal effects.

To Lewis Delfonti $432, for loss of personal effects and for damages for personal injuries.

To Henri Cirri, $1,018, for loss of personal effects and as damages for personal injuries.

To George Deslions, $25,000 for loss of property as baggage.

the right of the petitioner to a limitation of liability,. and the amount of the pending freight, it was decreed as follows:

"That the steamer La Bourgogne . . . was in fault and to blame in reference to the collision in question, in that she was proceeding at an immoderate rate of speed in a fog, contrary to law, and that the petitioner La Compagnie Générale Transatlantique is liable 'for the damages caused by the said collision to each of the claimants whose claims have been reported upon' and which have been 'confirmed in the amount so reported.'"

It was further recited in the decree:

"That the petitioner is entitled to limit its liability for such damages as are decreed as aforesaid to the amount of the value of the said steamer and her freight for the voyage, and that there is not to be included as going to make up said amount either the freight or passenger money received by the petitioner for the trip of said steamer La Bourgogne from Havre to New York, or for the trip from New York to Havre, during which voyage said collision occurred, or the amount of the money paid to the petitioner by the government of France under the contract proved between the petitioner and said government for the voyage on which the Bourgogne was lost."

The costs incurred in determining whether the petitioner was at fault were given to the claimants, while the costs incurred in determining whether the petitioner was entitled to a limitation of liability were awarded to it and made "payable, primarily, out of any fund herein that is or may come into the hands of the trustee." The prosecution of other actions and suits was perpetually enjoined. The following indorsement was made on the back of the decree:

" (Endorsed.)—Final decree.—This decree substantially follows the practice of both the Eastern and Southern Districts of New York as regards the question of an interlocutory judgment and is in other respects deemed correct.—E. B. T., U. S. J."

Those whose claims were allowed appealed from so much

of the decree as granted the limitation of liability and as determined the *quantum* of pending freight to be surrendered. The S. S. White Dental Company and various death claimants appealed from the disallowance of their claims. The petitioner also appealed from so much of the decree as held the La Bourgogne at fault and allowed recovery in favor of the various claimants.

These two classes of appeals were heard separately in the Circuit Court of Appeals. Those of the claimants were decided on June 23, 1905. Before passing on the merits the court was required to consider a motion to dismiss, made by the petitioner on the ground that the claimants had not appealed within the statutory time. This was based on the contention that the final decree was not that entered by Judge Thomas in 1904, from which the appeals were taken, but the one entered by Judge Townsend in 1902. The court held that Judge Townsend's decree of 1902 was but interlocutory and that of Judge Thomas was final.

On the merits, it was decided that it had been rightly held that La Bourgogne was in fault for going at an immoderate speed in a fog, but that such fault was not committed with the privity or knowledge of the petitioner. In these respects, therefore, the decree below was affirmed. As the Cromartyshire was not present, the court expressly refrained from stating any opinion as to any concurring fault on her part, remarking that her presence was not necessary, as with the allowance of death claims even one-half of the damage found in this proceeding would greatly exceed the sum transferred to the trustee in limitation of liability. It was further decided that the court below was right in rejecting the claim of the S. S. White Dental Company. It was held, however, that the court erred in excluding the claims for damage caused by loss of life, and therefore it was ordered that proof as to their amount should be taken to the end that they might participate in the fund. On the question of pending freight it was decided that the court below had correctly held that no part of the

freight and passage money collected for the sailing from Havre to New York, or of the subvention paid by the French government, should be surrendered as freight pending, yet that error had been committed in deciding that the freight and passage-money collected for the sailing from New York to Havre should not be paid over as a part of the pending freight. 139 Fed. Rep. 433.

On December 14, 1905, the appeal on behalf of the petitioner, in so far as not already passed upon, came on for hearing. The claimants objected to the hearing because the petitioner had not actually paid over to the trustee the sum of the freight and passage money for the last sailing from New York to Havre, which the court had held to be pending freight to be surrendered under the law for limitation of liability. The court, without referring to the subject, passed upon the appeal. In disposing of the merits while observing that in view of the large amount of the death claims which the claimants were at liberty to establish as a result of the previous decision, the petitioner was really without any substantial interest to dispute the correctness of the awards in favor of the various claimants, nevertheless, in consequence of the possibility that its ruling on that subject might not be final, the court considered the various awards and decided that no error had been committed in respect to any of them, Wallace, Circuit Judge, dissenting, however, as to the allowance made to the claimant Deslions. 144 Fed. Rep. 781.

As the case is before us not only because of the allowance of a writ of certiorari applied for by the claimants, but also on a cross writ asked on behalf of the petitioner, all the questions presented by the record are open and, as far as they are essential, must be disposed of. Primarily, the question impliedly passed upon by the Circuit Court of Appeals, concerning the timely taking of the appeals to that court, requires attention. To dispose of the subject we must decide whether the decree entered by Judge Townsend in 1902 or that entered by Judge Thomas in 1904 was the final decree.

The authorities concerning the distinction between interlocutory and final decrees were cited in the opinion in *Keystone Manganese & Iron Co.* v. *Martin,* 132 U. S. 91, and the subject was fully reviewed in *McGourkey* v. *Toledo O. C. R. Co.,* 146 U. S. 536. The rule announced in these cases, for determining whether, for the purposes of an appeal, a decree is final, is, in brief, whether the decree disposes of the entire controversy between the parties, and illustrations of the application of the rule are found in the late cases of *Clark* v. *Roller,* 199 U. S. 541, 546, and *Ex parte National Enameling Co.,* 201 U. S. 156. Now the case in the trial court primarily involved the right to a limitation of liability. The case further involved the nature and amount of the claims which were to be allowed against the fund. When the proceedings were commenced all the questions concerned in this latter subject were referred to a commissioner, to receive formal proof and make report. When the commissioner reported the aggregate amount of the claims, objections were filed on behalf of the petitioner. No action, however, was immediately taken by the court on these objections, but the case proceeded as to the right to a limitation of liability. When that subject was ready for action it was impossible to finally dispose of the case as an entirety by passing upon the contests which had arisen concerning the claims, because no other than formal proof in regard thereto had been made. Under these circumstances the court, for the purpose of furthering the progress of the cause, so that a final decree might be reached with reasonable celerity, passed upon the questions which were ripe for its action, that is, whether the petitioner was entitled to the limitation of liability and the sum of the pending freight. It also passed upon the claims for loss of life, because it was deemed that their generic character rendered it impossible to prove them against the fund. All questions concerning the other claims, both as to law and fact, were remitted for proof as an essential prelude to a final decree. Under these conditions the case, we think, may be likened to one where a decree of foreclosure is entered

concerning the sale of mortgaged property, but without a determination as to the amount due by the mortgage debtor, in which case, as pointed out in *Keystone Manganese Iron Co.* v. *Martin, supra,* referring to the case of *Ray* v. *Law,* 3 Cranch, 179, the decree of foreclosure would be but interlocutory and not susceptible of being appealed from as a final decree. Besides, as pointed out in the *McGourkey case,* if the court below has treated a decree as interlocutory, and there is doubt on the subject, that doubt should be resolved in favor of the correctness of the conceptions of the lower court. It may not be doubted on the very face of the decree of 1902, especially in view of the indorsement made upon the final decree by Judge Thomas that it was considered both by Judge Townsend and Judge Thomas, that the decree of 1902 was merely interlocutory. And such was, undoubtedly, the contemporaneous view taken by all the parties, since, except by an inadvertent notice of appeal given by the clerk of a proctor for several claimants, no appeal was taken from the decree of 1902, while all parties treated the decree of 1904 as the final decree and appealed therefrom.

We are thus brought to the merits of the case, and shall consider separately the various contentions.

1. *Was La Bourgogne at fault for the collision?* For the reasons which caused the Circuit Court of Appeals to decline to consider whether there was fault on the part of the Cromartyshire, we put that question out of view. The District Court, after a careful review of the evidence, found that, although the navigation of La Bourgogne was in other respects faultless, that navigation was clearly negligent, because there was a failure to moderate her speed in the dense fog which prevailed at the time of the collision, which undue speed was the sole cause of the collision, it being found that there was no fault on the part of the Cromartyshire. The court found, after making all possible allowances, that the steamship must have been running at about ten knots an hour when she was struck by the Cromartyshire. While not considering whether there was

.fault on the part of the Cromartyshire, the Circuit Court of Appeals concurred in the finding of the District Court as to fault on the part of La Bourgogne, because of her immoderate speed. On this subject the court said:

"A careful examination of all the testimony produced here has satisfied us that although there may have been a reduction, she was certainly not going any slower and was probably going faster than ten knots. It is unnecessary to rehearse the evidence, the statement in the opinion below is sufficient indication of the grounds for this conclusion; the character and extent of the wound received by the 'Bourgogne' are suggestive of a high speed on her part. Undoubtedly the fog was exceedingly dense, that fact is uncontradicted, and the steamer had not 'reduced her speed to such a rate as would enable her to stop in time to avoid collision after an approaching vessel came in sight, provided such approaching vessel were herself going at the moderate speed required by law.' *The Chattahoochee*, 173 U. S. 540. We are emphatically of the opinion that such a speed under the circumstances was excessive, and since it probably prevented an earlier foghorn blast being heard from the 'Cromartyshire,' it cannot be held not to have been a proximate cause of the collision."

We may not disturb the concurrent findings of both the courts below as to the density of the fog and the rate of speed of the steamship at the time of the collision, unless we are of .opinion that those findings were so unwarranted by the evidence as clearly to be erroneous. *The Carib Prince*, 170 U. S. 655, 658; *The Wildcroft*, 201 U. S. 378, 387. As our examination of the record does not enable us to reach such a conclusion, we accept the findings below as to fog and speed for the purpose of determining the question of fault of the steamship. That upon the facts found both courts were correct in holding La Bourgogne at fault, because she was moving at a rate of speed prohibited by the international rule as interpreted by the decisions of this court, is too clear for anything but statement. This, in effect, is not disputed by the petitioner, since

the contention is not that error was committed in finding the vessel at fault if the conceptions of immoderate speed prevailing in the courts of the United States be applicable, but that the error consisted in not applying the conceptions on the subject entertained by the French courts, which, it is urged, are less rigorous as to what constitutes undue speed in a fog. Thus counsel say:

"It is not claimed by the petitioner that upon the facts so found this conclusion would be erroneous, if this question between the claimants and the petitioner [steamship company] is properly to be determined by our rule and by the test which our courts apply as to what constitutes moderate speed in a fog."

From this premise it is argued first, that as La Bourgogne was a French ship, and as all the claims arose exclusively because of damage done to persons or property on board the steamship, the fault of that vessel should be tested by the theory which would be applied in the courts of France; and, second, that accepting the conditions as to fog and the rate of speed found by the courts below, if the international rule as enforced in the French courts be applied it would follow that the rate of speed was moderate, and therefore the steamship was not at fault.

It was settled in *The Scotland,* 105 U. S. 24, that a foreign ship is entitled to obtain in the courts of the United States the benefit of the law for the limitation of liability of shipowners. But it was also decided in the same case (p. 29) that "if a collision occurs on the high seas, where the law of no particular state has exclusive force, but all are equal, any forum called upon to settle the rights of the parties would, *prima facie,* determine them by its own law, as presumptively expressing the rules of justice; but if the contesting vessels belonged to the same foreign nation the court would assume that they were subject to the law of their nation carried under their common flag, and would determine the controversy accordingly. If they belonged to different nations, having

different laws, since it would be unjust to apply the laws of either to the exclusion of the other, the law of the forum, that is, the maritime law as received and practiced therein, would properly furnish the rule of decision. In all other cases each nation will also administer justice according to its own laws. And it will do this without respect to persons, to the stranger as well as to the citizen."

The contention we are now considering does not appear to have been made below, as among the errors assigned on behalf of the petitioner in the Circuit Court of Appeals was one to the effect that the District Court had erred in not holding that the ship Cromartyshire was solely in fault for the collision, an alleged error which could not have been based upon the contemplation that the test was to be that of the French law alone. Be this as it may, however, we are of the opinion that we must decide the case before us by the international rule as interpreted in the courts of the United States, and not by the practice under that rule prevailing in the French courts, if there be a difference between the two countries. The petitioner is here seeking the benefits conferred by a statute of the United States, which it could not enjoy under the general maritime law. Strictly speaking, the application for a limitation of liability is in effect a concession that liability exists, but, because of the absence of privity or knowledge, the benefits of the statute should be awarded. It is true that under the rules promulgated by this court the petitioner is accorded the privilege not only of seeking the benefits of the statute, but also of contesting its liability in any sum whatever. This does not, however, change the essential nature of the proceeding. As the petitioner called the various claimants into a court of admiralty of the United States to test whether, in virtue of the laws of the United States, it should be relieved in part at least of liability from the consequences of the acts of its agents, and, as the international rules have the force of a statute, we think the issues presented were of such a character as to render it essential that the right to exemption should be

tested by the law as administered in the courts of the United States, and not otherwise.

2. *The collision having been caused by the fault of the servants of the petitioner, was that fault committed with its privity or knowledge?*

As both courts held that there was no privity or knowledge, and as that question primarily is one of fact the rule which we have hitherto applied as to the effect to be given to the concurrent findings of fact made by two courts might well be adequate to dispose of this subject. But it is elaborately insisted that the cause before us as to this particular subject does not come within the rule, because the courts below, while reaching a like conclusion, did so on different conceptions. As, in any event, the duty would devolve upon us of determining whether the findings of the courts below were clearly unsustained by the proof, and as we think, moreover, it is not clear that the courts below rested their conclusions solely upon common findings of fact, we propose, as briefly as may be, to consider the propositions relied upon to demonstrate that error was committed by both courts in deciding that there was an absence of privity or knowledge. Before doing so, however, we must dispose of a contention, greatly pressed in argument, that whether there was privity or knowledge is not to be tested solely by the proof, but is to be adjudged against the petitioner because of a legal presumption asserted to arise from a suppression of evidence alleged to have been by it committed.

Without amplification, the circumstances are these: Shortly after the inception of the cause at various times the testimony of captains of several of the steamships of petitioner was being taken out of court. In the course of doing so questions were addressed to the witness or witnesses concerning the contents of a log book or books in his or their possession. These questions the witnesses were instructed by the counsel for the petitioner not to answer. The matter was taken to the court, District Judge Brown presiding, and he ordered the questions

to be answered. Some months afterwards, when one of the captains was being examined out of court, there was a refusal to answer certain questions propounded, and the subject was again taken to the court for determination. The court said: "I think he [the witness] ought to answer this question. . . . There is a direction for the production of books, and in one way or another the thing is postponed and postponed, and defeated and defeated, under one argument and another argument, so that no progress is made. . . . I cannot understand your proceeding here. While you are contumacious, it does not make much difference whether it is your captain or your company. If you are contumacious I must dismiss the proceeding." Upon the protestation of counsel for the petitioner that no contumacy was intended, and that any book ordered to be produced which could be found would be forthcoming, the proceedings before the commissioner were resumed. In April, 1901, the claimants applied for an order directing the production by the petitioner of certain log books alleged to be in its possession. The court modified the request, and on May 15, 1901, entered the following order:

"That the petitioner produce on or before the trial of this case all logs kept on board the steamship La Bourgogne during the period of two years previous to the collision in the petition mentioned, and also all logs kept on any other steamer of the petitioner running between Havre and New York for the same time of which the same captain who was captain of the Bourgogne at the time of the collison was then master."

As we have stated, in October, 1901, the case came on for trial before Judge Townsend. The counsel for the claimants directed the attention of the court to the fact that the order for the production of the log books had not been complied with. Thereupon the counsel for the petitioner declared, in open court, that he had transmitted the order to the company and had a letter from it, stating that the log books for the period covered by the order had not been preserved and could

not be produced. Objections being made to this letter, the court remarked, concerning it: "That is not evidence. The logs may be lost, and then you have got to prove it. You have got to put somebody on the stand to prove it, to testify." Subsequently, during the examination of an official of the petitioner, a further effort to introduce the letter was made, but the court observed: "It is hearsay. It is simply a letter." In the course of the proceeding, consequent upon the order that the further testimony be taken out of court, the letter was offered before the commissioner, and, subject to an objection, was marked as an exhibit. No further direct action of the court on the subject was thereafter invoked by the claimants, and neither the trial court nor the Circuit Court of Appeals referred to the subject in their opinions. Under these circumstances we think the contention here made, that it is our duty to decide the case, not according to the proof, but upon a presumption of wrongdoing and suppression of evidence, is without merit. We say this because we are of opinion that if the claimants deemed that the letter explaining the reason for the non-production of the log books was not admissible, or that there had been contumacious suppression of evidence, it was clearly their duty, before or at the hearing, to have made an attempt to offer secondary evidence, or, in the event of the impossibility of so doing, to have asked at the hands of the court a dismissal of the proceedings, if such action was appropriate, or such other action for the alleged contumacy as the case required, and, if necessary, have saved an exception to an adverse ruling.

The fault on the part of La Bourgogne being established, it becomes necessary, before considering the contention that there was privity and knowledge on the part of the petitioner, to develop the nature and character of the acts which would constitute privity and knowledge within the intendment of the law relating to the limitation of liability of ship-owners.

The law on the subject is now embodied in §§ 4282 to 4287 of the Revised Statutes. Summarily stated, the first of these

sections gives an absolute exemption to a ship-owner for losses sustained by fire, unless the fire was caused by the design or neglect of such owner. The second section does not give an unlimited exemption, since the exemption which it accords does not embrace "the amount or value of the interest of such owner respectively in such vessel and her freight then pending," and accords the limited exemption from liability upon the condition that the loss has occurred "without the privity or knowledge" of the owner or owners. The remaining sections we need not now consider, as they relate to the mode of apportionment of the loss where there are joint owners or concern the administrative features of the law.

These sections are a substantial reënactment of the act of March 3, 1851, c: 43, 9 Stat. p..635. The purpose of the act of 1851 in according to ship-owners the right to limit their liability in whole or in part, and the meaning of that act, as well as the purpose and meaning of the sections of the Revised Statutes embodying the provisions of the act of 1851, have been often before this court and have been conclusively adjudicated. *Moore* v. *American Transportation Co.,* 24 How. 1; *Norwich Co.* v. *Wright,* 13 Wall. 104; *The Benefactor,* 103 U. S. 239; *The Scotland,* 105 U. S. 24; *The North Star,* 106 U. S. 17; *Providence & N. Y. Steamship Co.* v. *Hill Mfg. Co.,* 109 U. S. 578; *The City of Norwich,* 118 U. S. 468; *Butler* v. *Boston Steamship Co.,* 130 U. S. 527.

In *Moore* v. *American Transportation Co.,* Mr. Justice Nelson, delivering the opinion of the court, thus stated the purpose of the limitation of liability which the act granted (24 How. 39): "The act was designed to promote the building of ships and to encourage persons engaged in the business of navigation and to place that of this country on a footing with England and on the continent of Europe."

In the *Hill case,* 109 U. S. 598, after summarizing the various provisions of the act of 1851 and calling attention to the rules previously adopted by this court to enforce the same, concerning the general purpose of the act the court said (p. 588):

"In these provisions of the statute we have sketched, in outline, a scheme of laws and regulations for the benefit of the shipping interest, the value and importance of which to our maritime commerce can hardly be estimated. Nevertheless, the practical value of the law will largely depend on the manner in which it is administered. If the courts having the execution of it administer it in a spirit of fairness, with the view of giving to ship-owners the full benefit of the immunities intended to be secured by it, the encouragement it will afford to commercial operations, as before stated, will be of the last importance; but if it is administered with a tight and grudging hand, construing every clause most unfavorably against the ship-owner, and allowing as little as possible to operate in his favor, the law will hardly be worth the trouble of its enactment. Its value and efficiency will also be greatly diminished, if not entirely destroyed, by allowing its administration to be hampered and interfered with by various and conflicting jurisdictions."

In that case, briefly, the facts were these: Freight was shipped from Providence to New York by the Oceanus, a steamer belonging to the steamship company. The goods were destroyed by fire while on board the steamer. An action was brought in a state court of Massachusetts against the steamship company to recover the value of the goods burned, on the ground of the negligence of the company. In its answer the steamship company claimed the benefit of the limitation of liability statute, averring that if the loss was occasioned by negligence the same was without its privity or knowledge. Pending this action proceedings for limitation of liability were commenced by the steamship company in a District Court of the United States. These proceedings were pleaded by an amendment to the answer in the state court. A trial was commenced, but the jury was discharged and the case was reserved to the Supreme Judicial Court of Massachusetts, which held that if the fire happened through the negligence of the steamship company it necessarily followed that it had occurred with

its privity or knowledge, and, therefore, the case was not within the act of Congress limiting the liability of ship-owners. Subsequently the steamship company set up the final decree of the District Court in the limitation of liability proceedings barring the claim in question. Thereafter a trial was had in the state court and there was verdict and judgment against the steamship company, and the judgment was affirmed by the Supreme Judicial Court of Massachusetts. This court held that the proceedings for a limitation of liability excluded the jurisdiction of the state court. In determining the case it became necessary to decide whether, if there was negligence of the owner of a vessel in case of fire within the meaning of the first section of the act of 1851, such negligence was the necessary equivalent of privity and knowledge of the owner, as expressed in the third section of the act. It was held that the two provisions were not necessarily coterminous, that negligence under the first section of the act might exist so as to prevent the unqualified limitation given by that section, and yet the owner of the vessel be entitled to the more limited exemption given by the third section, which depended upon the absence of privity or knowledge. In other words, it was decided that although a loss might have happened by the negligence of the owner of the vessel, such loss might yet not have been occasioned with the knowledge or privity of such owner.

Without seeking presently to define the exact scope of the words privity and knowledge, it is apparent from what has been said that it has been long since settled by this court that mere negligence, pure and simple, in and of itself does not necessarily establish the existence on the part of the owner of a vessel of privity and knowledge within the meaning of the statute. And nothing to the contrary is properly to be deduced from the case of *The Main*, 152 U. S. 122, so much relied upon in argument, for that case did not purport in the slightest degree to overrule or qualify the previous decisions, and was concerned, not with the meaning of the words privity and knowledge, but with the rule to be applied in determining

what constituted pending freight within the meaning of the law for the limitation of liability. And this is also true of the English cases which were cited in the opinion in that case. It may be that there are general expressions found in some cases in the lower Federal courts, decided both before and after the *Hill case*, which lend color to the assumption that privity and knowledge as defined in the statute is but the equivalent of mere negligence. Such of the cases relied upon, however, as were decided before the authoritative interpretation of the statute in the *Hill case*, were necessarily overruled by that decision, and so far as those decided since may be inconsistent with the previous rulings of this court, they are clearly not entitled to weight.

We come to consider the various contentions pressed to sustain the proposition that the fault of immoderate speed which occasioned the collision was committed with the privity and knowledge of the petitioner.

*a.* It is argued that there was a positive duty on the part of the petitioner to make regulations directing that its steamers be not run at an immoderate rate of speed in a fog, and, as there was a failure to perform this duty, privity and knowledge was established. But both the courts below found the proposition of fact upon which this contention rests to be without foundation, and we think they were clearly right in so finding.

As early as December, 1884, the company made an order as follows:

"Our board of directors, having seriously in mind the numerous collisions which daily occur at this season in the parts frequented by our steamers, we come to beg you to recall to all our captains, individually, the recommendations which we have always made to them, to use the greatest prudence in their navigation, and to never hesitate in certain doubtful cases to adopt the most suitable measures to assure the safety of their steamers, even if a loss of time should result from so doing.

"You will insist upon it with them that in times of fogs

the most active watch be kept on board their vessels and that all the prescriptions indicated in the rule as to collisions be strictly observed, as well by day as by night."

And prior to 1891 the substance of this order was contained in the permanent regulations, which were expressed in the rules prevailing in 1891, as follows:

"Article 293. When the company's vessels are in localities frequented by vessels, especially in foggy weather and during the night, the engineer on watch and the necessary men for maneuvering must be within reach of the apparatus for changing the speed. The order is given by the officer of the watch to the engine room, and mention is made in the ship's log and in that of the engineer of the hour at which that order was given and received."

"Article 394. The company's vessels conform to the international rules for the purpose of preventing collisions. A printed copy of said rule is posted up in a conspicuous place in order that the officers may take notice of it.

"The prescriptions of said rule, relative to phonic signals to be caused to be heard in foggy weather, must be rigorously observed; besides, in said circumstances, a man must be placed aloft on lookout.

"Article 395. In conformity with the rules of international regulations, having for object the prevention of collisions, all vessels under steam which approach each other so that there may be risk of collision, must diminish their speed, or stop or go backwards, if necessary. All vessels under steam must, during foggy weather, preserve a moderate speed.

"The captain, under these circumstances, must diminish the speed of his engines, and, in agreement with the agent of posts, the captain must make known by proces verbal delays which such maneuver may have occasioned."

While it is true that the proof does not establish that the circular letter of 1881 was brought to the notice of all the captains who were in the service at the time of the collision, nevertheless the purpose of the company to secure a compliance

with the law is demonstrated by the issuance of the circular. The elaborate argument indulged in to establish that article 395, which in terms stated and commanded compliance with the international regulations, was a subterfuge, intended to enable the captains to violate those regulations, rests upon mere surmise, and, we think, finds no support in the record. The contention that the rules, as promulgated, were not sufficiently explicit is also without merit. The regulation in terms reiterated the international rule and called for compliance with its provisions. It could not, in the nature of things, have been made more explicit. This was aptly pointed out by Townsend, District Judge. He said:

"It is not clear that any further precautions than those established by the orders and regulations, quoted above, would have been practicable.

"The question of rate of speed in a fog is one which cannot be determined by set rules, but must be left largely to the discretion of the officers of the ship. They are entrusted with the responsibility of the carriage of mails, freight and passengers, at the greatest speed which is consistent with safety. Their own lives, as well as those of the passengers and crew, are at stake.

"The determination of the question, therefore, as to what is to be done in all the varying stages between a light haze and a dense fog, rests upon a great variety of circumstances and conditions, all looking toward the question of what is a moderate rate of speed in existing conditions."

b. That however full may have been the compliance by the petitioner with the duty to make regulations, it was necessarily in privity and knowledge with the immoderate speed which caused the collision, as it knowingly encouraged or tolerated the violation of its regulations, because it knew of the constant habit on the part of its captains to navigate at an immoderate rate of speed in a fog, and did not prevent the illegal practice. This involves primarily a question of fact, and was adversely found against the claimants by both the

courts below, and from the consideration which we have given to each and all of the arguments urged in many forms of statement to demonstrate that the findings made on the subject were clearly wrong, we are not only not satisfied that such was the case, but, on the contrary, are convinced that the findings of the courts below were clearly right. It is insisted, however, that the record does not show that there were findings on the subject by both the courts below. This is rested upon the assertion that the Circuit Court of Appeals did not, in substance, affirmatively find on the subject, but erroneously rested its conclusion solely upon a presumption in favor of the petitioner, which it deemed to be controlling. This is based upon an isolated passage in the opinion of the Circuit Court of Appeals, where it was said:

"Upon the proof as it stands we cannot find that the petitioner's officers knowingly tolerated or encouraged the running of its steamers at excessive speed in fogs, or were negligent in failing to enforce the rules; certainly they used due diligence in securing officers of experience and ability. We concur in the conclusion that the disaster was done, occasioned or incurred without the privity or knowledge of the owners."

But the passage thus relied upon was preceded by a reference to the evidence, which the claimants asserted tended to establish that the infractions of the moderate speed rule had been so constant as to bring home knowledge to the petitioner that its rules were being habitually violated, and by a finding that the proof was not adequate to so show. Even, however, if the passage in the opinion sustained the inference sought to be deduced from it, we think no error was committed, especially in view of the meaning of the words privity and knowledge as expounded by the previous decisions of this court. The petitioner having shown the promulgation of regulations for the conduct of its business, which exacted a compliance by the captains of its vessels with the international rules, we think the burden of proving that the rules were not promulgated in good faith or that a willful departure from

their requirements was indulged in, and was brought home to or countenanced by the petitioner, was cast upon the claimants, and that the court properly held that that burden was not sustained by the evidence.

And the considerations which we have stated also completely dispose of the contention not referred to in the opinion of either of the courts below and apparently not brought to the notice of the trial court or assigned as error in the Circuit Court of Appeals, viz., that privity and knowledge as to the fault which caused the collision was necessarily to be inferred from the terms of the contract for subsidy made by the petitioner with the French government. The contract in question was executed in virtue of a statute authorizing the same. The French government agreed to give to the petitioner a gross annual sum by way of subsidy for the operation of a weekly line "from Havre to New York, that is, fifty-two voyages, going and returning, a year." Among other things, in consideration of the payment of the subsidy, the petitioner engaged "to transport gratuitously all the mails upon the line from Havre to New York," and, "furthermore, to transport gratuitously all gold, silver and copper coins for the use of the state, and to undertake the carrying of postal packages," upon conditions fixed by law.

The contract was voluminous and minute. To secure the use of steamers of the standard required it exacted that no steamer already built should enter upon the service until it was inspected by officers of the French government and certified to be in all respects completely up to the standard and thoroughly equipped in every particular, as required by the French law, and that the steamers thereafter to be built for the service should come up to the requirements of construction exacted by the contract, and should also, before being permitted to enter the service, be inspected and certified as being properly constructed and equipped' in every respect. To maintain the standard of efficiency the contract contained abundant regulations. It established also regulations as to

the manning and operation of the steamers, and moreover was replete with provisions tending to secure the safety and comfort of passengers and crew. To secure compliance a governmental commission was created, under the supervision of the Minister of Posts and Telegraphs, full power being conferred upon the commission thus created to take cognizance of the operation of the steamers, to examine their logs and other documents, and to enforce in every particular the performance of the contract requirements. There was a clause, moreover, authorizing the presence on each steamer of an agent of the postal department and a delegation of authority in respect to the operations of the line under the contract to the consul general of France at New York. The law authorizing the contract also required that the steamers should at their trial develop a speed of seventeen and one-half knots, with the privilege of forced draught, and should maintain under the contract a mean annual speed "of at least fifteen knots an hour at the ordinary rate," and the requirement as to the fifteen knots an hour minimum average speed was expressed in the contract. The payment of the subsidy was stipulated also in article 49, as follows:

"The payment of the subsidy shall be ordered at the end of the term by the Department des Postes et des Telegraphes from month to month and by twelfths, subject to the deduction of the sums retained, which may have been pronounced in the cases provided in these specifications.

"The payments shall take place at Paris or at Havre at the option of the contractor."

The deductions referred to in this provision evidently contemplated the system of fines and premiums concerning speed, contained in article 45 of the contract, as follows:

"In the case that the mean annual speed fixed in article 20 above shall be exceeded, there shall be allowed to the contractor a premium calculated at the rate of 12 francs a ton gross gage and by the tenth of a knot of increase of speed over the required rate. If the mean annual speed is not obtained, the

contractor shall be subject to a retention calculated, at the rate of 8 francs a ton gross gage and by the tenth of a knot under the required rate.

"At the end of each annual period, including an aggregate of fifty voyages, going and returning, there shall be prepared a report of the result of each crossing. The total of these partial results shall establish the figure of the mean speed and consequently of the premium which shall be accorded for employing it to the contractor, or of the retention which ought to be imposed upon him, save an account being kept in this last case of circumstances of *vis major* duly authenticated.

\* \* \* \* \* \* \* \*

"In no case shall the amount of the premium for the year exceed twelve hundred thousand francs (1,200,000 fr.). Art. 6 of the law of June 24th, 1883.

"When one of the steamers employed in the service shall not attain the mean speed of fifteen knots for ten consecutive voyages, going and returning, it shall be rejected as unfit. It may be presented for new trial after modifications, or it shall be replaced by a new boat within a maximum delay of thirty months."

The contention is, that as the steamships were only required to develop under forced draft a maximum speed of seventeen and one-half knots, and yet in operation were obliged to maintain a mean average annual speed of fifteen knots, it must have been known that the contract could not be performed unless the steamers were run at an immoderate speed in a fog, and hence plainly shows that the petitioner must have had privity or knowledge of the habit of running at an immoderate speed. Ultimately considered, the proposition but asserts that the contract on its face manifested a clear purpose on the part of the French government and the petitioner to violate the international rule. We think to state the contention is to demonstrate its want of merit. It invites us without proof to conjecture as to the prevalence and duration of the conditions of fog which might be encountered during many ocean

crossings, and from such surmise to decide not only that the petitioner, but the government of France, entered into a contract having for its purpose the violation of the international rule, which it was not only the duty but, as shown by the contract, was the manifest purpose of the government on the one side to enforce and of the petitioner on the other to obey. It moreover asks us, without proof, to assume that a contract which was evidently carefully drawn to attain the permanency of the service and secure the efficiency and safety of the ships engaged in such service, and of the lives and interests of all those who might take passage on such ships, was in effect intended to accomplish a contrary and disastrous result. But it is argued, however conclusive these considerations may be as to the purpose of the French government in making the contract, they are without weight when the privity and knowledge of the petitioner as to immoderate speed is alone considered. This proceeds upon the assumption that, as the contract required an average speed of fifteen knots, and gave a reward for exceeding that speed, and imposed a penalty for a failure to maintain it, therefore the petitioner had a direct incentive to operate its steamers at an immoderate speed, and, as the subsidy was earned, the petitioner must have known that its vessels were being operated in fogs in violation of law. This, however, again but invites us into the region of mere conjecture. Besides, it disregards the fact that the contract, in terms exempted from the operation of the penalty clause a falling below the average speed caused by *vis major*. It moreover disregards the express terms of the contract, by which complete governmental supervision over the operation of the steamers was provided, and the full power to investigate documents and papers concerning every crossing, which was reserved to the government officials, a power retained obviously for the purpose of securing not only the speedy but the safe operation of the steamers. Besides, the contention presupposes that the incentive which the contract afforded of a comparatively small premium to be earned in the opera-

tion of a half dozen or more valuable steamships must, as a matter of legal presumption, be treated as having been a sufficient motive to induce the petitioner to sanction conduct by its captains, which not only was in direct violation of law, but recklessly endangered the lives and property of those on board, as well as hazarded the loss of the great sums invested in the steamships. And these considerations also dispose of the argument based upon the fact that a small part of the premium, if earned, was allowed by the company to the captains of its steamers.

It is insisted that, as it was shown that La Bourgogne was not fully equipped with the life boats, life rafts and disengaging apparatus required by the laws of the United States, therefore the limitation of liability should not have been accorded. We do not stop to consider the deduction drawn from the premise of fact which the proposition assumes, because we think that premise is devoid of foundation. There can be no question that La Bourgogne was fully equipped in every particular as required by the law of France. By Rev. Stat., § 4488, made applicable to foreign vessels by the act of August 7, 1882, c. 441, 22 Stat. 346 it is required that—

"Every steamer navigating the ocean . . . shall be provided with such numbers of life boats, floats, rafts, life preservers, and drags, as will best secure the safety of all persons on board such vessel in case of disaster; and . . . shall have the life boats required by law, provided with suitable boat-disengaging apparatus, so arranged as to allow such boats to be safely launched while such vessels are under speed or otherwise, and so as to allow such disengaging apparatus to be operated by one person, disengaging both ends of the boat simultaneously from the tackles by which it may be lowered into the water."

And in the same section it is provided that "the board of supervising inspectors shall fix and determine, by their rules and regulations, the kind of life boats, floats, rafts, and life preservers, and drags that shall be used on such vessels," etc.

By Rev. Stat. § 4489 it is provided that—

"The owner of any such steamer who neglects or refuses to provide such life boats, floats, rafts, life preservers, drags, pumps or appliances as are, under the provisions of the preceding section, required by the board of supervising inspectors, and approved by the Secretary of the Treasury, shall be fined one thousand dollars."

Rev. Stat. § 4405 makes it the duty of the supervising inspectors and the supervising inspector general to meet once a month as a board and to "establish all necessary regulations required to carry out in the most effective manner the provisions of this title, and such regulations, when approved by the Secretary of the Treasury, shall have the force of law."

Exercising the authority thus conferred upon them, the board fixed the total capacity of life boats and life rafts on steamers navigating the ocean of the tonnage of La Bourgogne at 5,670 cubic feet. It is not questioned that La Bourgogne was equipped with life boats and life rafts to the capacity of 6,600 cubic feet, nearly a thousand feet more than the regulations having the force and effect of law required. Nor is it disputed that the vessel was duly inspected under the law and received the certificate of complete equipment required by the statute, and was certified to be entitled to carry 1,019 passengers, many more than were on the steamer at the time she was lost. And, indeed, the supervising inspector and assistant testified that La Bourgogne had complied with all the requirements imposed.

The argument is that although all the things just stated be true, yet as the statute, when closely considered, required a greater capacity of life boats and rafts than was exacted by the regulations, the statute, and not the regulations, must be considered in determining the sufficiency of the equipment. But we think this is completely answered by the context of the statute, and especially by § 4405, which gives to the regulations of the board the effect of law. The contention that the section is inapplicable is without merit. It proceeds upon

the assumption that the act of August 7, 1882, which subjected certain foreign steam vessels to the requirements as to equipment and to the inspection laws of the United States, and brought them under the authority of the board of supervising inspectors, did not cause the rules of the board to be law as to such foreign vessels, although it made them law as to every other vessel subject to the statute.

As originally enacted, the first chapter of Title 52 of the Revised Statutes related generally to the subject of inspection of steam vessels. The second section (4400) excluded from the operation of the title "vessels of other countries," and therefore all the sections of that chapter, as well as of the following chapter, relating to the same subject, had no relation to such vessels. When the amending act of 1882 was enacted its initial words amended and enlarged § 4400 by adding at the end of such section the following words: " . . . And all foreign private steam vessels carrying passengers from any port of the United States to any other place or country shall be subject to the provisions of" seventeen enumerated sections. When the sections thus enumerated are examined it becomes apparent that they were particularly designated because the amendment of their context was deemed especially appropriate to the fruition of the general purpose of the statute, which was to bring foreign steam vessels under the sway of the requirements of the laws of the United States as to equipment, inspection, etc., hitherto applicable only to domestic vessels. Because § 4405, which gave to the duly enacted rules and regulations of the board of supervising inspectors the force and effect of law, was not specially enumerated in the amendatory act, does not support the proposition that it was not intended that the provisions of that section should have application to foreign steam vessels. To so hold would be but to say that although the regulations were made applicable to foreign vessels and the owners of such vessels were commanded to obey the same, yet such command was not made obligatory, thus frustrating the very purpose of the amendatory act and

rendering its requirements entirely nugatory. Aside, how-
ever, from this impossible conclusion, the contention is wholly
devoid of merit, because both §§ 4488 and 4489 were among
the sections especially enumerated in the amendatory act of
1882. The effect of this was to make beyond all peradventure
those sections applicable to foreign steam vessels, and, there-
fore, to subject the owners of such vessels to the duty of com-
plying with the rules and regulations made by the board of
supervising inspectors as to life boats and other equipment,
under the pain of incurring the penalty provided by the stat-
ute. And the reasons just given dispose of the contention con-
cerning the boat disengaging apparatus. There is no question,
as found by both courts, that the apparatus in use on La
Bourgogne was that required by the board, and the officers of
the board testified that the apparatus in use was adopted in
compliance with their requirements and was the best and only
apparatus suitable for the purpose. Again, the contention
that the regulations of the board are inconsistent with the
statute, we think when the statute is considered as a whole,
is without merit. Even, however, if it were otherwise, as com-
pliance on the part of the petitioner with the regulations
adopted by the board was compelled by law, it cannot be that
upon it was cast the duty of disobeying the regulation at its
peril, thus, on the one hand, subjecting it in case of non-com-
pliance to the infliction of penalties, and on the other hand,
if it fully complied with the regulations, imposing a liability
upon the assumed theory that there had been a violation of
law.

3. Concluding, as we have, that the petitioner was entitled
to the benefit of the act limiting liability on making the sur-
render exacted by the statute, we are brought to consider the
controversies as to what constituted the freight then pending
within the meaning of the law for limitation of liability.

Both courts below agreed that petitioner was not obliged
to surrender the passenger and freight receipts earned on the
sailing from Havre to New York, because such receipts were

not freight then pending within the meaning of the statute. As §§ 4283 and 4284,. Revised Statutes, are *in pari materia*, the two must be considered together, and therefore the freight then pending, referred to in § 4283, is freight then pending for "the same voyage," or "for the voyage," as these words are used in § 4284. The vessels of petitioner made trips from Havre to New York and from New York to Havre without any intermediate stops. It is clear that, in common parlance, each of these trips was a separate voyage. Undoubtedly the word voyage may have different meanings under different circumstances, depending on the subject to which it relates or the context of the particular contract in which the word is employed. This is illustrated by the use of that word in the subsidy contract, where the word is used as signifying a sailing from Havre to New-York and the return trip to Havre. But we need not now concern ourselves with what may be the meaning of the word voyage under all possible circumstances, or what was its significance as used in the subsidy contract, since we are now called upon only to fix the meaning of the word as applicable to the case before us in virtue of the sections of the Revised Statutes referred to. That significance must be ascertained by considering the context of the sections and the remedy which they were intended to afford; in other words, their obvious intent and purpose. The intimate relation between the provisions of the two sections, which were both in the act of 1851, was pointed out in considering that act in *Norwich Company* v. *Wright*, 13 Wall. 104, and, concerning the purpose and intent of the statute, it was observed in that case (p. 111):

"The phrase is added 'on the same voyage' to confine the participation in the apportionment to the freighters of a single voyage and not to permit the ship owner to bring into the compensation losses sustained on the prior or other voyages."

The statute thus confining those who are entitled to participate in the pending freight to be surrendered to the persons whose lives or property were at risk in the common adventure or voyage in which the freight was earned, and excluding those

who may have suffered loss from a previous voyage or trip, it follows that, as applied to the case before us, the then pending freight for the same voyage embraced only the distinct sailing between the definite termini, New York and Havre, and therefore did not include freight earned on the previous sailing from Havre to New York. This leads to the conclusion that both courts were right in not requiring the surrender of the freight earned on the sailing from Havre to New York, and requires us only to consider whether the Circuit Court of Appeals was right in reversing the ruling of the trial court, to the effect that there was no obligation to surrender the sums which had been prepaid for freight and passage on the sailing from New York to Havre upon which the vessel was lost. As pointed out in *Norwich Co.* v. *Wright, supra,* where a vessel is lost on a voyage, and thereby contracts of transportation are unperformed, it may be that there will be no freight earned and none to be surrendered. But in the case before us it is unquestioned that the freight and passage money which was received by the petitioner for the voyage was paid to it under absolute agreements that the sums so paid were in any event to belong to the petitioner, which were tantamount to stipulations that although such freight and passage moneys might be only partially earned, the right to the whole amount was contractually complete. Under these circumstances, in view of the decision in *The Main,* 152 U. S. 122, holding that the duty to surrender pending freight to entitle to a limitation of liability must be liberally construed against the ship-owner, we are of opinion that the Circuit Court of Appeals was right in holding that the petitioner was under the obligation to surrender the sums in question. See *O'Brien* v. *Miller,* 168 U. S. 287, 303; *Pacific Coast Co.* v. *Reynolds,* 114 Fed. Rep. 877.

And the reasoning just stated disposes of the contention, as to which both courts decided adversely, that there was a duty to surrender as pending freight one fifty-second part of the annual subsidy paid by the French government, covering the period of the voyage during which La Bourgogne was lost,

since if one fifty-second part under the contract embraced the round trip from Havre to New York and back, only one-half of that sum, at the best, would be applicable on account of the voyage or trip from New York to Havre. But both the courts below were right, we think, in deciding that, in view of the nature and character of the contract of subsidy and the state of the proof, no part of the gross sum paid as subsidy for the year could be properly treated as freight earned and then pending for the voyage in which the vessel was lost. We say in view of the nature and character of the contract, because when all the obligations imposed by that instrument are considered, and the power with which it endowed the French government as to deductions for fines and penalties is borne in mind, we think it cannot rightfully be said that a particular portion of the annual subsidy was so dedicated to a particular trip as to cause any portion of the subsidy to become freight earned for that trip, and pending within the meaning of the statute. The provision as to the fifty-two voyages was in a measure distributive of the total annual payment. But when the whole contract is taken into view we think the annual subsidy was substantially indivisible and the solidarity begotten by the terms of article 45 of the contract between all the voyages and the gross amount of the subsidy excludes the conception that the result of one trip may be isolated and treated as pending freight for that voyage. We have said, also, in view of the nature of the proof, because the evidence is merely that a certain sum was paid for the year, which was less than the maximum amount of the annual subsidy fixed by the contract, and no means is afforded for determining whether any deduction was made on account of the failure of La Bourgogne to complete the last voyage, or whether such proportionate amount was earned by the substitution of another vessel.

4. The action of the courts below concerning the claims against the fund remain only to be considered.

We first dispose of the claims based upon loss of life which

the trial court disallowed and which the Circuit Court of Appeals held were entitled to be proved against the fund.

It was settled in *The Harrisburg*, 119 U. S. 199, that no damages can be recovered in admiralty for the death of a human being on the high seas, or on the waters navigable from the seas, caused by negligence, in the absence of an act of Congress, or a statute of a State, giving the right of action therefor. As said in *Butler* v. *Boston Steamship Co.*, 130 U. S. 555, the maritime law of this country, at least, gives no such right. But in *The Hamilton*, 207 U. S. 398, it was also settled that where the law of the State to which a vessel belonged—in other words, the law of the domicil or flag—gives a right of action for wrongful death if such death occurred on the high seas on board of the vessel, the right of action given by the law of the domicil or flag will be enforced in an admiralty court of the United States as a claim against the fund arising in a proceeding to limit liability. As La Bourgogne was a French vessel, the question is, therefore, did the law of France give a right of action for wrongful death caused by the collision in question?

Article 1382 of the Napoleon Code provides as follows: "Every act whatever of man, that causes damage to another, obliges him, by whose fault it happened, to repair it." The text of this article is found in article 2294 of the Louisiana Code, and in substantially the same form was found in the Spanish law. *Hubgh* v. *New Orleans & C. R. R. Co.*, 6 L. An. 495. While as lucidly shown by Chief Justice Eustis, in delivering the opinion in the case just cited, the provision in question did not, under the law of Spain or Louisiana, in the absence of express statute to that effect, confer a right of action for a wrongful death, it may not be doubted that in France, as also pointed out in the same case, such right of action has been constantly recognized and enforced from the date of the enactment of the Code Napoleon. See the decisions of the French courts collected under article 1382 of the Code Napoleon, in the Fuzier-Herman annotated edition of that code, Paris,

1896, vol. 3, page 766, No. 688 *et seq.* Indeed, under the settled interpretation of the article of the Code Napoleon the right to recovery for wrongful death is not dependent upon heirship or other relationship by consanguinity or affinity, but upon the ability to prove the existence of damage to the claimant arising from wrongful death. The doctrine is thus stated: "The action brought to repair the damage caused by an accident, especially by an accident which has been followed by death may be brought, not only by the heir of the victim but also by any one, whether heir or not, who has been directly injured by the consequences of the accident." See decisions collected under No. 688, and the immediately following paragraphs in the Annotated Code just previously cited. Indeed, in controversies in the French courts concerning injuries asserted to have been suffered by loss of life caused by the sinking of La Bourgogne, the right to recover for loss by death was impliedly conceded to exist, although relief was denied in the particular cases, on the ground that the steamer was not, under the proof, at fault for the collision.

Such being the law of France, it follows, under the doctrine of the *Hamilton case,* the Circuit Court of Appeals rightly held the claims for loss of life to be provable against the fund created in the limited liability proceeding, unless it be that some exception takes the case out of the general rule. It is insisted that such an exception obtains, even although the French law allows recovery upon claims of that nature, because under the facts found as to the speed of La Bourgogne the vessel would not have been held by the French courts to have been negligent, and therefore no recovery could have been had in France. But it is not denied that the international rule governs in the French courts, and hence the same legal duty as to moderate speed in a fog is exacted by law in both this country and France. The proposition then is this, that the right of action allowed by the French law may not, for the purposes of the limitation of liability, be allowed by the courts of the United States, unless such courts abdicate their functions by

declining to draw their own inferences from the proof as to negligence, and, to the contrary, make such inferences as they assume would be drawn by a French court if the proof was before such court.  The duty to enforce the cause of action given by the French law does not carry with it the obligation to disregard the proof by declining to give it that effect to which it is entitled under the law as administered in the courts of the United States.  Moreover, as we have said previously, as the petitioner is here an actor, seeking to avail of the benefits of a statute of the United States, it becomes the duty of the courts of the United States to determine the question of fault by the international rule as they interpret it.  And in the nature of things it cannot be that the vessel which seeks the benefit of the law of the United States can be held to be in fault and not in fault concerning the same act or acts.

The conclusions hitherto expressed as to the want of privity and knowledge, and the adequacy of the equipment of the steamship, dispose of the contention that the claim of the S. S. White Dental Company was erroneously disallowed. The contentions made to establish that error was committed by both courts in allowing the other claims rest ultimately upon mere questions of fact, and are therefore without merit, since we cannot in any event say that the proof clearly shows error.  But passing this, as there is no contest between the claimants and the sum of the claims enormously exceeds the fund for distribution, we do not think the petitioner's interest is such as to require an investigation of the sufficiency of the reasons which caused the courts below to allow the claims. Finally, we consider the proposition that it was error to have allowed the limitation of liability, because the petitioner had not actually paid over to the trustee the amount of the pending freight.  But there was an honest controversy whether there was any pending freight to be surrendered.  The trial court, when its attention was called to the failure to surrender any sum as pending freight, refused to direct such surrender, and reserved the subject for future action.  The final decree

which that court made held there was no pending freight, and therefore nothing to be surrendered. While the Circuit Court of Appeals differed with the trial court as to one item—the freight from New York to Havre—we do not think that court was required, as a condition for affirming the grant of limitation of liability, to exact the payment of the disputed money into court, or the giving of bond therefor, until the possibility of the review of its action was at an end. Of course, where in proceedings for limitation of liability the petitioner contumaciously refuses to put the court in actual or constructive possession of the fund to be distributed, relief might properly be withheld and the petition for limitation of liability be dismissed. But where, as here, a *bona fide* controversy existed as to whether particular moneys were or were not pending freight, and there also existed no question as to the solvency of the petitioner, the court did not err in declining to impose conditions upon the granting of relief tantamount to an assumption that the claim of the petitioner was untenable, in advance of a final determination of the disputed issue. We have confined the foregoing opinion to those general propositions which we deem essential to dispose of the case. We have hence refrained from expressly noticing many minor points pressed in the voluminous argument submitted at bar. Because we have so done, we have not overlooked but have considered them all, indeed have disposed of them all, as the reasons we have given, when ultimately considered, conclude every contention made. As neither party has prevailed in this court each must pay his own costs in this court.

*Affirmed.*