## THE MIST–CHIEF.
## In re KNIGHTS.
### No. 1648.

District Court, D. Rhode Island.

Sept. 24, 1931.

Stephen R. Jones, of Boston, Mass., and Wm. B. Greenough and Richard E. Lyman, both of Providence, R. I., for petitioner.

Henry H. Hunt, of Hartford, Conn., and Francis J. O'Brien, of Providence, R. I., for respondent Henry R. Savage.

Harold A. Andrews (of Hinckley, Allen, Tillinghast, Phillips & Wheeler), of Providence, R. I., for claimant.

LETTS, District Judge.

There is before the court the petition of Albert J. Knights, as owner of the motor yacht Mist-Chief for limitation of his liability, and also the proof of claim of one Roger F. Dunham for salvage.

In September, 1930, the motor yacht Mist-Chief was located at Onset, Mass. Negotiations had been in progress for the sale of the yacht by Knights, its owner, to one Webb of Saybrook, Conn. These negotiations had reached the point where one Skilton, together with two other men, were sent to Onset for the purpose of moving the yacht to Saybrook. It was to be operated under the papers of Knights. Although there had been some discussion between the parties in regard to making delivery of the boat at Onset rather than at Saybrook, and although a check for $5,000 of the purchase price had been given to Knights, the transaction had not as yet been fully consummated, and the title to the vessel still remained in Knights. The testimony presented is insufficient to make clear whether Skilton, and his two companions, were agents of Knights or Webb, the intended purchaser. Subsequent developments, however, render the determination of that question of no great importance.

After leaving Onset, some trouble developed in the operation of one of the two motors, a situation which prompted Skilton and his two companions aboard the yacht to put in at a wharf at Watch Hill. Skilton then communicated by telephone with Knights at Saybrook, advising him of the trouble with the yacht and resulting in Knights going to Watch Hill to have the boat put in operating condition.

When Knights arrived aboard the yacht, he assumed charge and direction of what went on. He personally investigated the trouble reported, found that it was due to a slipping of the couplings upon one of the drive shafts and proceeded to make repairs. While thus engaged, Skilton, at either Knights' direction or with his full knowledge and approval, filled the gas tanks in preparation for resuming the trip. It appears that the two regular gas tanks, both of which were filled by Skilton, were in the stern of the boat. Another tank in the bow, which had been originally intended for the storage of water, had been used by Knights for

a reserve gas supply. This tank also Skilton filled.

Shortly thereafter and while Knights was working in the motor compartment, noticeably strong gas fumes were detected, which were found to come from the bilge. Investigation disclosed that the source of the gasoline which found its way into the bilge came from the forward end of the boat where the reserve gas supply had been taken aboard. The testimony is unconvincing as to whether there was a leak in the reserve tank or whether gas had been permitted to overflow when filling. It is not of any great importance which was the fact. The fumes were undeniably in the boat, and the presence of that condition obvious to all on board.

Knights claimed that he promptly opened, or had opened, all ventilating facilities on the boat. The hatchways leading down to the engine compartment where Knights was at work were open. There was considerable discussion between Skilton and Knights in regard to the electric bilge pump and Knights' proposal to start it so as to eject the water and gasoline which had accumulated in the bilge. Knights appeared determined to proceed in that manner and Skilton appears to have vigorously advised of the danger of the fumes being ignited by sparks from the motor operating the pump. This phase of the case, however, to which much testimony was devoted, is not particularly significant, in view of the fact that the uncontradicted testimony indicates that the bilge pump never was started, and that the switch controlling its operation was pulled by Skilton at the outset of the discussion. There is no testimony that it was at any time thereafter connected.

There was, however, in the boat another small electric pump. This was the automatic pressure pump which supplied water to the toilet room. There is no testimony that this pump was operating at the time the explosion occurred. It was, however, connected and in operating condition. With this situation existing and while Knights was still in the engine compartment, the fumes in some undisclosed manner were ignited causing an explosion of considerable force, bursting the hull of the boat which quickly sank. Knights was burned, and Savage, one of Skilton's companions on the trip who was also then on the boat, was more or less seriously injured. Savage thereafter brought suit against Knights, alleging negligence, in the state courts of Connecticut, and appears in this case opposing Knights' petition for the limitation of his liability.

Section 4283, Revised Statutes (46 USCA § 183), provides in part as follows: "The liability of the owner of any vessel * * * or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred without the privity, or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

The above statute was enacted to promote the building of ships, to encourage persons and corporations to engage in the business of navigation, and to enable private interests in this country to compete on an equal footing with England and the countries of continental Europe where the rules of maritime law had from at least as early as the seventeenth century provided for a limitation of liability on the part of the owner of vessels. Uniformly our courts have held, and under the guidance of the Supreme Court (La Bourgogne, 210 U. S. 95, 28 S. Ct. 664, 52 L. Ed. 973), that the statute should be so construed as to give the shipowner the benefit of the intended immunities. In most cases involving the question of limitation of liability under this statute, the paramount inquiry is in respect to the privity or knowledge of the owner of the defect, condition, or other cause of the injury or damage.

In the present case that question would occupy an obscure position, and the principal question would be that of negligence if the evidence had disclosed the cause of the explosion. This is due to the fact of the owner being on board and having assumed control and direction. If the gasoline fumes in the yacht resulted from a leak, as Skilton testified, in the forward tank which was filled, there is no evidence that Knights knew that the tank was defective. In other words, there is no evidence to justify a finding of privity or knowledge on the part of the owner in connection with the intrusion of the gasoline into the bilge.

After the situation in regard to the fumes had arisen, there was obviously a duty on the part of Knights to safeguard with all precautionary means against an explosion. He did open, or have opened, part or all of the ventilating facilities of the boat to clear the fumes. His testimony is to the effect that everything possible to open was opened.

The claim is now made that the main switch should have been pulled which would have put the pressure pump out of commission. It is entirely possible that the explosion resulted from the failure promptly to do so. There is, however, no evidence in the record which would justify the classification of that conclusion as anything more than a probability and a reasonable guess. One might also speculate as to the possibility of a match having been struck on deck or a lighted cigarette having been laid by one other than Knights within the proximity of fumes emanating through one of the apertures which had been opened. A finding of negligence cannot be predicated upon speculation. Clear it is that Knights himself was not alert to a danger or he would not have remained in the engine compartment, probably the most dangerous position on the boat.

Whatever the real facts may be, I am compelled to find that the testimony presented is insufficient to establish the claim of negligence on the part of Knights. With this finding there is, therefore, no liability to limit.

■■■ The remaining question relates to Dunham's claim of salvage. As already stated, the boat, following the explosion, almost immediately sank near the wharf where it was moored. This wharf was used and the presence of the boat at that location was an obstruction. It appears also that, while the hull of the boat was damaged beyond repair, the motors were of considerable value. Had they been permitted long to remain submerged in the salt water, it is probable that they would soon have become of little value. Dunham promptly proceeded to raise the boat and to take it on shore at his place of business nearby. He was not requested to do so, nor was he advised that it should not be done. Skilton, who had been in charge of the boat until Knights arrived on board, indicated to Dunham that the boat was abandoned.

Dunham's claim is for removing the motors, taking down, cleaning, and reassembling them. No serious contention has been advanced that his work was not properly done or that his charges were unreasonable. It is urged only that what he did was not salvage. Maritime law has for centuries, in the interests of commerce and as an encouragement to prompt voluntary service to minimize personal and economic loss, recognized claims for compensation to those who rescue property from the peril of the sea.

While a forbidden service may not be recognized as a basis of a salvage claim, the right to recover is not dependent upon any expressed invitation or contractual understanding. It is in its nature a voluntary service and need not have been solicited. In the present case the danger from the action of the salt water, upon the only part of the boat of value, did exist. The other circumstances are characteristic of a salvage service.

I am of the opinion that the claim, being for the outlay of labor and expense alone, should be allowed in the amount proven at the time of the trial, even though it presumably represents the greater part of the value of the property rescued.

A decree, consistent with the above findings, may be submitted by counsel for settlement.