BURNETT *v.* TEXAS CO.

---

W. L. BURNETT, TRADING AS BURNETT MOTOR COMPANY, v. TEXAS COMPANY.

(Filed 29 March, 1933.)

1. **Contracts B e—Under terms of contract dealer could hold refining company liable only for defects in pumps at time of installation.**

Plaintiff and defendant entered into a contract whereby plaintiff was to sell at retail gasoline bought from defendant at wholesale, and defendant was to furnish and install certain pumps and equipment necessary to such retail distribution, and plaintiff was to keep such equipment in repair. Plaintiff brought suit for loss occasioned by a defect in the pumps which caused them to deliver more gasoline than was indicated on the dial thereof. *Held,* defendant would be liable only for such loss as was occasioned by a defect in the pumps at the time of their installation, it being plaintiff's duty under the contract to keep the equipment in repair.

2. **Indemnity A a—Refining company held indemnified against loss caused dealer by defects in pumps under the contract between the parties.**

Where a contract for the retail distribution of gasoline bought by the dealer from a refining company provides that the refining company should furnish certain pumps and equipment for such retail distribution, and stipulates that the dealer should exonerate the refining company and hold it harmless from all claims, suits and liabilities arising from the existence of such equipment: *Held,* by the terms of the agreement the dealer was barred from bringing action against the refining company for loss alleged to have been caused by a defect in the pumps which caused them to deliver more gasoline than was indicated on the dial thereon.

CLARKSON, J., dissenting.

CONNOR, J., concurs in the dissent.

BURNETT v. TEXAS CO.

CIVIL ACTION, before *Small, J.,* at February Term, 1932, of COLUMBUS.

The defendant owned a filling station near Chadbourn, and on or about 12 December, 1930, entered into a written agreement with the plaintiff by the terms of which the plaintiff was to operate the filling station. The written instrument stipulates:

1. "The company leases to the dealer for installation and use  .  .  . three Wayne Motor Pumps; three 550 U. G. tanks; one metal day sign complete, one certified service sign, one gold motor oil sidewalk sign; four M-15 lube oil units. Said equipment is leased at dealer's request to be used by him on said premises for storage and sale of petroleum products purchased solely from the company, but at all times is to remain the property of the company."

2. "The dealer shall at his expense, keep said equipment in good order and repair and not encumber or remove said equipment, or do or permit anything to the prejudice of the company's title;  .  .  . exonerate the company and hold it harmless from all claims, suits and liabilities of every character whatsoever and howsoever arising from the existence of such equipment."

3. "The dealer shall return said equipment to the company at the termination of this agreement in good condition."

It was further provided that "the expense of installing this equipment shall be made by the dealer.  .  .  . The company acknowledges receipt of one dollar from dealer for such expense. If actual installation costs exceed the amount above specified, the dealer shall pay the company the amount of such excess promptly upon completion of the installation. If amount above specified exceeds actual cost of installation, the company shall promptly refund to dealer such excess."

The evidence tended to show that the plaintiff began the operation of the filling station and on 11 May, 1931, brought this suit, alleging that the defendant had negligently furnished the plaintiff Wayne Electric Pumps for the sale of gasoline, but that such pumps were defective in that they did not correctly measure gasoline purchased by customers, and that as a result of such defect, plaintiff had suffered loss in the sum of $1,500. It was also alleged that the defendant had required the plaintiff to buy a certain uniform for the sum of $13.00.

The defendant set up the written agreement as a bar to plaintiff's right to recover and denied all negligence alleged in the complaint.

The plaintiff testified that the tanks were installed and had been used previously by another person, and that he was required to buy gasoline exclusively from the defendant and was to receive two cents per gallon. He further testified that "the measuring apparatus was out of repair and would give over and the dial would stick and not even turn.  .  .  . I lost about one-third of the gasoline I sold."

Another witness for plaintiff testified about the tanks and said: "They did not measure correctly. . . . The motor would not start part of the time. There was nothing broken about the pumps. . . . I was there when these pumps were installed by Mr. Foster. He did not leave them all right. I think 'it gave about one point over 5 gallons when it first started off. The pumps were installed about 2 weeks before Burnett got it."

The plaintiff further testified that when he discovered that the equipment did not correctly measure gasoline that he made complaint to the defendant, and that it sent an agent to "fix the tank. . . . They measured all right while he was there, but he only worked on one tank, and the other was not right. They would freeze up at night and would not work, and we would have to wait until a mechanic came the next morning and start them up. People came there to work on these tanks in response to my complaints around a dozen times and up until the new tanks were put in."

The following issues were submitted to the jury:

1. "Did the defendant furnish to the plaintiff for use at the Chadbourn Filling Station electric pumps and gas tanks?

2. "If so, did such pumps operate so as to deliver more gas to the customer than shown on the indicator thereon?

3. "If so, what damages, if any, is plaintiff entitled to recover on account thereof?

4. "In what sum, if any, is the defendant indebted to the plaintiff on account of money deposited for the suit of clothes, set out in the complaint?

5. "Did plaintiff execute the agreement, or contract, dated 12 December, 1930, and marked Exhibit 2?"

By consent the court answered the first issue "Yes," the fourth issue "$13.12 with interest from 31 April, 1931," and the jury answered the second issue "Yes," the third issue "$400.00," and the fifth issue "Yes." The court being of the opinion that the answer to the fifth issue constituted a bar to recovery, rendered judgment that the plaintiff recover the sum of $13.00 with interest and costs, from which judgment the plaintiff appealed.

*E. Manley Toon, and Varser, Lawrence, McIntyre & Henry for plaintiff.*

*Powell & Lewis for defendant.*

BROGDEN, J. The records of this Court and of courts generally, disclose a variety of contracts between oil companies and the operators of filling stations. The written contract between the parties specified that

the defendant leased the equipment to the plaintiff "for installation and use." Although the contract further provided that the alleged lessee should keep the equipment in repair, nevertheless it was the duty of the defendant to furnish to the plaintiff equipment reasonably suitable for the purposes contemplated by the parties. The defendant was desirous of selling its products, if possible, and undertook to furnish equipment for hire to facilitate such sale. Consequently it knew that the installation or furnishing of defective equipment would occasion loss to the operator or dealer. Manifestly, if defects developed after installation and furnishing, it was the duty of the plaintiff to make repairs, but there is no evidence in the record tending to show that the equipment so furnished was defective at the time it was placed in the custody of the plaintiff. See *Andrews v. Oil Company, ante,* 268, 12 A. L. R., 766, *et seq.;* 61 A. L. R., 1333, *et seq.,* and *Rushing v. Texas Co.,* 199 N. C., 173, 154 S. E., 1.

Notwithstanding the liability imposed by law, the plaintiff signed an agreement contracting to "exonerate the company and hold it harmless from all claims, suits and liabilities of every character whatsoever and howsoever arising from the existence of such equipment." There is no allegation of fraud or mistake, or other available equity, and hence the contract which the parties have made, must be interpreted according to its terms. The language referred to is broad and comprehensive and clearly imports a release from claims arising from the existence of the equipment. Therefore, the principle of law declared in *Singleton v. R. R.,* 203 N. C., 462, is applicable and determinative.

No error.

CLARKSON, J., dissenting: I find no fault in this part of the opinion of the Court: "Although the contract further provides that the alleged lessee should keep the equipment in repair, nevertheless it was the duty of the defendant to furnish to the plaintiff equipment reasonably suitable for the purposes contemplated by the parties." Nor in the opinion of the Court that "there is evidence in the record tending to show that the equipment so furnished was defective at the time it was placed in the custody of the plaintiff." It was so found by the jury that heard the evidence, and the verdict should be upheld.

That there is a liability, under the evidence and the finding of the jury, I am in agreement, but I cannot assent to the fatal conclusion of the court that the plaintiff is estopped by his contract with the defendant to claim damages arising from the equipment by reason of the defective condition at the time it was taken over by him, as the evidence tended to show and as the jury in its verdict found. It is true that the plaintiff did sign an agreement to "exonerate the company and hold it harm-

less from all claims, suits and liabilities of every character whatsoever and howsoever arising from the existence of such equipment." I think the context of the written contract clearly shows that this had reference to claims, suits and liabilities, which might arise from third parties and not to the parties to the contract.

The entire section of the contract reads as follows: "The dealer shall at his expense, keep said equipment in good order and repair and not encumber or remove said equipment, or do or permit anything to the prejudice of the company's title; comply with all laws, ordinances and regulations, applicable to such equipment and the premises on which it is installed; exonerate the company and hold it harmless from all claims, suits and liabilities of every character whatsoever and howsoever arising from the existence of such equipment."

While there is no allegation of fraud or mistake, or other available equity, as the court's opinion states, it is not necessary to resort to an equitable remedy. In my opinion a plain construction of the above section of the contract shows that it referred to what took place after the equipment was taken over, with reference to third parties, and did not refer to the parties to the contract.

If it be granted that the contract is susceptible of the interpretation placed upon it by the court, it cannot be denied that it is also susceptible of the interpretation herein stated that it referred only to third parties and not to the parties to the contract. And if the latter proposition be granted, then the conclusion of the court should not prevail, for the contract was written by the defendant, all that the plaintiff had to do was to "sign on the dotted line." There is no evidence that he did more than that. All of the evidence is to the effect that all he had to do to the contract was to sign it. It is elementary learning that in an ambiguous contract the courts will construe the words most strongly against the party who wrote and used them. Clark on Contracts (4th ed.), sec. 223, p. 562; *Woods v. Postal Telegraph-Cable Co.*, 205 Ala., 236, 87 So. 681, 27 A. L. R., 834; 6. R. C. L., 854.

As was said in *Gillet v. Bank of America,* 55 N. E., 292, 160 N. Y., 549 (head note), "Where there is any uncertainty as to the meaning of the agreement, the language is to be construed against the party who proposes it rather than against the party who is invited to accept it." The reason for this is succinctly stated in Clark on Contracts (4th ed.), at pp. 562-3, as follows: "The principle on which this rule is based has been said to be that a man is responsible for ambiguities in his own expressions and has no right to induce another to contract with him on the supposition that his words mean one thing, while he hopes the court will adopt a construction by which they would mean another thing more to his advantage."

This principle is not at variance with the holding of the court in the recent case of *Andrews v. Oil Co., ante,* 268, that an agreement ought to receive that construction which will best effectuate the intention of the parties to be collected from the whole of the agreement, but is in accord with what was held in that decision.

In my opinion, there was error in the court below declining to render judgment in accordance with the verdict of the jury.

CONNOR, J., concurring in dissent.