## THE SOUTH COAST.*

### WILLEY et al. v. HOBBS, WALL & CO.
### No. 7362.

Circuit Court of Appeals, Ninth Circuit.

June 15, 1934.

Geo. K. Ford and Carl A. Onkka, both of San Francisco, Cal., for appellant Dahl.

H. W. Hutton, of San Francisco, Cal., for other appellants except Dahl.

Lillick, Olson & Graham and Chalmers G. Graham, all of San Francisco, Cal., for appellee.

Before WILBUR and GARRECHT, Circuit Judges, and NORCROSS, District Judge.

GARRECHT, Circuit Judge.

This is an appeal from a final decree in admiralty, granting petition of appellee for limitation of liability, as a result of the loss of the steamer South Coast, owned and operated by appellee. The steamer and crew were lost on September 16, 1930, and, no value having been saved, the claims of appellants were dismissed with prejudice to the institution of any other or further proceedings.

The South Coast was a wooden vessel of

301 gross tons, built in San Francisco in 1887, and equipped in 1898 with a steel boiler. She left the port of Crescent City, Cal., bound for Coos Bay, Or., loaded with a cargo of logs consigned to Baker & Co., and, after disappearing in the haze seaward, nothing further was heard from the vessel or those on board. There is no dispute that she was properly officered and manned, with a complement of nineteen officers and men, none of whom, after the ill-fated voyage, were ever seen again.

At the time of the loss of the steamer South Coast, and for many years prior thereto, one Stanley Pedder was the secretary and active manager of appellee in charge of the management, operation, and control of its affairs, and Ralph W. Myers was a director and the operating manager of the vessels of appellee, including the steamer South Coast, and Ira Thompson was general manager looking after the mill and store, land and lumber of appellee at Crescent City. He was a landsman, and knew nothing about marine matters, and had nothing whatsoever to do with the management, operation, and navigation of any of the vessels of appellee, and gave no orders, instructions, or suggestions in connection with the loading or stowing of said vessels, or the time or conditions under which they should depart from said Crescent City, all of which was particularly true concerning the steamer South Coast. Thompson was never an officer of said appellee.

Appellee's principal place of business was in the city and county of San Francisco, Cal., and from this office Pedder managed the business of the corporation, and Myers managed the operation of the steamers, including the said steamer South Coast. During the time in question, none of the officers or directors of appellee other than those named had or purported to have anything whatsoever to do with the management or control of the affairs of said appellee in the operation of its vessels. The evidence is to the effect that active manager Pedder was not a mariner or nautical man, and had delegated the operation of the vessels of appellee, and more particularly the steamer South Coast, to the operating manager Myers, who in turn had delegated to the master of the steamer South Coast all matters pertaining to her navigation, loading, and stowage of cargo at all ports other than the port of San Francisco, and there was no representative, officer, director, or employee of said appellee in any port other than the port of San Francisco, or otherwise than as hereinbefore stated having

to do with the management, operation, navigation, loading, stowage, or handling of any of the vessels of appellee, and particularly the steamer South Coast.

At the time of the loss of the South Coast, September 16, 1930, operating manager Myers had been the manager of the steamers of appellee for about 25 years; that as such operating manager he was acquainted with the condition of the said vessel as to the hull and machinery prior to the time of its loss, and he testifies that when she left San Francisco for Crescent City she was absolutely seaworthy.

On the afternoon of September 17, 1930, the day after the South Coast had left Crescent City for Coos Bay, appellee received a wireless message sent from the steamer Lake Benbow, then at a point south of Cape Blanco in the Pacific Ocean, indicating that it had sighted a vessel's wreckage and was passing through an area covered with numerous floating logs. The appellee immediately communicated with the consignee of the cargo at Coos Bay and ascertained that, although the South Coast should have reached there between 8 and 9 o'clock in the morning of that day, it had not then arrived.

On the same day the vessel Tejon, a tanker bound from San Diego, Cal., to Seattle, Wash., also passed through numerous logs and wreckage. Her master testified that at one point he changed his vessel's course to avoid striking an object, and passed about 50 feet therefrom. He said that it appeared to him to be the top of a steam schooner's house. He also testified that he saw another object which looked like the forepart of the house in front of the wheel, and there were two posts that stuck up like the fenders which steam schooners usually have placed alongside this house to keep the lumber cargo from injuring it.

On September 18th a United States Coast Guard cutter proceeded to the scene of the reported wreckage. At about noon of the 19th three boats, some parts of a wheel house and nameplate marked South Coast and other wreckage were discovered. The boats were destroyed to prevent their menacing navigation.

Appellants maintain that the South Coast was shattered to pieces by the explosion of her boiler.

Winslow Conn, chief inspector of engines and boilers in the San Francisco district, testified that the South Coast was seaworthy as to engines and boilers, and that a certificate

had been issued on April 3, 1930, which indicated, that in the opinion of the United States Steamboat Inspection Service, the vessel was in all respects seaworthy.

Captain John P. Tibbetts, inspector of hulls in the San Francisco district, called by appellants, personally inspected the South Coast in March and April, 1930, and as a result of the inspection found her seaworthy, and, following his recommendation, a certificate of seaworthiness was issued. Captain Tibbetts testified that he knew of no fact which would render the vessel unseaworthy between the time of the issuance of the certificate in April, 1930, and the time of the loss of the vessel, and that had there been any occurrences which would have rendered her unseaworthy it would have been reported to him in the ordinary course of his business. He further testified that the master would have been subject to a heavy penalty for failure to report any such occurrences and that none were reported.

J. McDonald, assistant inspector of boilers, inspected the South Coast in March, 1930, and testified that certain work was recommended to be done and was completed as recommended, and that the boiler of the vessel was all right and in good condition, and that the next annual inspection of the vessel would have taken place in April, 1931, and that the inspection in April, 1930, was sufficient to carry it through until April, 1931. Mr. McDonald further testified that had any defects arisen between April and September, 1930, they would have been reported by the licensed engineer to his office, and none were so reported, and that as to the parts inspected by him (particularly the boiler), the vessel remained seaworthy to and including September, 1930, when it was lost.

Mr. McDonald testified at considerable length on cross-examination in respect to his examination of the boiler, stating that he applied 210 pounds of steam pressure to the boiler to test it, which was half the steam pressure beyond that permitted during navigation, and that in his opinion, following his inspection and the issuance of the certificate, the boiler was in sufficiently good condition to last at least another year until the next annual inspection.

Among other things, the District Court found that at all the times after the steamship South Coast left San Francisco on September 6, 1930, the management, control, and navigation of said vessel, including the determination of when it was or was not safe to go in or out of Crescent City, as to the manner that the cargo should be loaded, and what, if any, repairs were necessary or desirable for the steamer, were all under the sole and exclusive control of Captain Stanley Sorensen, who was in sole command as master.

The evidence showed that he had theretofore been duly licensed by the United States Department of Commerce, Steamboat Inspection Service, as a master of steam vessels, and navigated on the Pacific coast between ports in the states of California, Oregon, and Washington; also that he had previously served as first and second mate on the South Coast, and was at the time a competent, efficient, and qualified master mariner.

The record of the Weather Bureau discloses that weather conditions on the 15th and 16th of September, 1930, off the coast of Oregon and upper California were a general overcast sky with fog and light, moderate winds. Navigators plying the sea in the vicinity where the wreckage was found on September 18th and 19th testified to the existence of a more or less foggy condition. One of the witnesses testified concerning weather between noon on the 16th and 17th; that he had almost had a collision that afternoon on account of the fog, and that the fog whistle had been used for about three hours; that in navigating up the Coast in that vicinity sometimes he had been in a fog bank near the inner side and had gone out a few miles into clear weather; that there are dangerous reefs in the locality where the South Coast was lost, and that navigation there in fog or bad weather is hazardous; that in this area between Crescent City and Coos Bay there are strong currents which have no fixed or constant direction, and which may and do run inshore and offshore with varying degrees of speed at uncertain times, so as to render navigation in those waters dangerous, particularly in times of fog or storm.

The District Court found that as a result of the loss of the vessel nothing of value was saved; that there was no pending freight at the time of loss, and that the interest of the appellee in and to said vessel after its loss was of no value; that neither the said appellee, nor any of its officers, agents, or employees were privy or had knowledge of any neglect or defect giving rise to or causing the loss of said steamer South Coast and the members of the crew thereof.

If the facts of appellants' case had met the requirements that nothing but unseaworthiness of the vessel could explain the accident, the argument indulged in might be more persuasive, but here we have other

equally strong possibilities and presumptions. There is testimony of fog, of treacherous currents and dangerous reefs, so the thought that the South Coast ran into a fog and was drawn from her course by adverse currents and floundered on the rocks is as much within the realm of possibility as that an explosion of her boiler occurred.

Some of the cases cited by appellant are to the effect that where a vessel in calm weather at the beginning of a voyage, without reasonable explanation, from undiscovered causes sinks, a presumption of unseaworthiness arises where nothing but unseaworthiness can explain the accident. In re Eastern Transp. Co. (The Calvert) (D. C. Md.) 37 F.(2d) 355, 363. In Oregon Round Lumber Co. v. Portland, etc., S. S. Co. et al. (D. C. Or.) 162 F. 912, 920, also a case cited by appellant, this doctrine is summarized as follows: " * * * It not infrequently transpires that a vessel, after entering upon her voyage or engaging in the service for which she is dispatched, becomes unseaworthy, and damage ensues, without any apparent cause from stress of weather or collision in any way, or undue or negligent abuse in handling and navigating her, and in every such case the presumption obtains that she was unseaworthy at the time of entering upon her service. * * *"

In this case the evidence shows that there were adverse conditions of weather, of current and dangerous reefs, and there is no evidence how the vessel was being handled. Indeed, appellants' assumption that an explosion occurred might involve another equally plausible assumption that some one was negligent, and that the vessel was not "being properly handled." However, it is not necessary to indulge in a presumption here, as we think that the evidence sustains the finding of the District Court that: " * * * When the said vessel left the port of Crescent City, California, on the 16th day of September, 1930, bound for Coos Bay she was in all respects staunch, strong, tight and seaworthy, and properly and efficiently handled, officered, manned, equipped, stowed and fitted for the voyage."

There is another rule of law which applied to the evidence sustains the decision of the District Court. Even if unseaworthiness had been shown or could be presumed as the cause of the disaster, appellee would still be entitled to limit its liability, if such unseaworthiness was without privity or knowledge on its part. California Yacht Club v. Johnson (C. C. A. 9) 65 F.(2d) 245; The Prin-

cess Sophia (C. C. A. 9) 61 F.(2d) 339. The statute (46 USCA § 183) provides as follows: "The liability of the owner of any vessel, for any embezzlement, loss, or destruction, by any person, of any property, goods, or merchandise, shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred without the privity, or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

See, also, Supreme Court Admiralty Rule No. 51 (28 USCA § 723).

"The word 'privity' of the owner, as used in the statute, means some fault or neglect in which the owner personally participates. The word 'knowledge,' as used, means some personal cognizance, or means of knowledge, of which the owner is bound to avail himself, of a contemplated loss, or of a condition of things likely to produce or contribute to a loss, without adopting appropriate means to prevent it. (Cases cited.) Mere negligence does not necessarily establish existence on the part of the owner of 'privity or knowledge.' (Cases cited.) When the owner is a corporation, the privity or knowledge must be that of the managing officers of the corporation. * * * That is to say, corporations are chargeable with knowledge of the existence of defects, or become privy to acts of negligence causing the same, only when persons representing the corporations in such capacities as to speak for it are guilty of some negligence or omission to maintain the vessel in a seaworthy condition. (Cases cited.)" The Calvert, supra; La Bourgogne, 210 U. S. 95, 122, 28 S. Ct. 664, 52 L. Ed. 973.

Concerning the safety of the boiler and the responsibility of the owners therefor, the evidence shows that the appellee was guided by the directions and sought to conform to the requirements of the United States inspectors. In this regard, language from the case The Annie Faxon, 75 F. 312, 314 (C. C. A. 9), is apropos: "The assignment of error principally relied upon is that the court held that privity or knowledge of the defective condition of the boiler, and of the fact that it was not inspected as required by law, either in December, 1892, or after the repairs of June, 1893, could not be imputed to the petitioners. We are unable to perceive how there can be imputation of privity or knowledge to a corporation of defects in one of its vessel's boilers, unless the defects were

apparent, and of such a character as to be detected by the inspection of an unskilled person. The record fails to show that the defects were of this character. The testimony fairly sustains the finding of the court that the defects in the boiler were not patent, and that they could have been discovered only by applying the proper test after the repairs of June, 1893. The test was not applied, and in that omission is one of the elements of the negligence of the petitioners, as found by the court. When we consider the purpose of the law which is under consideration, and the construction that has been given to it by the courts, it is obvious that the managers of a corporation whose business is the navigation of vessels are not required to have the skill and knowledge which are demanded of the inspector of a boiler. It is sufficient if the corporation employ, in good faith, a competent person to make such inspection. When it has employed such a person in good faith, and has delegated to him that branch of its duty, its liability beyond the value of the vessel and freight ceases, so far as concern injuries from defects of which it has no knowledge, and which are not apparent to the ordinary observer, but which require for their detection the skill of an expert. The petitioners not only deputed the general inspection of the vessel to a competent person, but they had caused the boiler to be inspected by the local inspectors in December, 1892; and they had in their possession at the time of the accident the certificate of the local inspectors, under which they were justified in using the vessel for a year from that date. But it is urged that this certificate is void, first, for the reason that at the time of the inspection the inspectors did not enter the boiler to examine its condition, but put on water pressure of 187 pounds, and depended solely upon the sounds that might be heard during the moment that the pressure was on to determine the condition of the boiler. To this it may be said that if the local inspectors, who are public officers, failed to perform their duty, and made an insufficient examination of the vessel, the fault does not rest upon the petitioners, nor is there imputation to them of knowledge of such defective inspection, they having delegated the whole matter of the inspection of their vessels to a competent employee. * * *"

If unseaworthiness caused the loss of the South Coast, it yet must be held that such unseaworthiness existed without the privity or knowledge of the owners.

Affirmed.