THE CITY OF BANGOR.

In re BOSTON, NEW YORK & SOUTHERN
S. S. CO.

No. 614.

District Court, D. Massachusetts.
Feb. 13, 1936.

R. Chandler Davis, of Gloucester, Mass., for petitioner.

Bennett Sanderson and Thomas H. Walsh, both of Boston, Mass., for respondent.

Ann Winsor Sherwin, pro se.

McLELLAN, District Judge.

This is a petition for limitation of liability by the owner of the steamship City of Bangor, seeking a decree limiting its liability arising from the sinking of that vessel on December 26, 1933, in accordance with United States Code, title 46, §§ 183 to 189 (46 U.S.C.A. §§ 183–189).

By an interlocutory decree dated January 7, 1935, Carlton W. Wonson, esquire, of Gloucester, has been appointed trustee as provided by section 185 of title 46 (46 U.S.C.A. § 185). In accordance with this decree, title to the City of Bangor has been duly transferred to the trustee by a' marine bill of sale, duly left for record with the collector of customs for the port of Portsmouth, N. H. By order of court dated February 6, 1935, the above-named

trustee has also been appointed commissioner to receive claims, and has filed a report. The Federal Wharf Company, the owner of the dock at which the City of Bangor was tied up at the time she sank, has filed an answer to the petition, and has filed a claim with the commissioner. At the time of the hearing on the petition, Mrs. Ann Winsor Sherwin was also allowed to file a claim.

The facts follow: The City of Bangor was a wooden vessel, a side-wheeler. She was 277 feet long, and was fitted out to accommodate approximately 450 passengers. The petitioner, her owner, is the Boston, New York & Southern Steamship Company, a corporation organized under the laws of Delaware, and having a regular place of business in New York City. This company purchased the City of Bangor in 1929, and put her into condition, but because of business depression, she was never placed in service. Some time late in 1931, she was moved to the docks of the Federal Wharf Company and tied up next to a schooner which was moored there. She was placed in the care of Capt. Ingersoll, who had been in the service of the company before, held regular master's papers, and, so far as appeared, was thoroughly qualified to take care of the vessel while she remained tied up at the wharf. Capt. Ingersoll hired a watchman, Murphy, who lived on the boat. Shortly before the vessel sank, she appeared to be in good condition except that the caulking was coming out of some of the outer seams above the water line, where the wood had dried out in the sun. There was no evidence of leakage from this source prior to the time the City of Bangor sank. The respondent, Federal Wharf Company, urges that this condition of the vessel was the cause of her sinking. There is no doubt that Capt. Ingersoll knew just what the condition of the City of Bangor was. There was no evidence that he ever reported that there was anything dangerous in the condition of her seams to company officials in New York. Nor did the Federal Wharf Company ever call the condition of the seams to the attention of any other representative of the steamship company than a bookkeeper, Mr. Creegan, who paid a visit to the City of Bangor some time in November of 1933. Mr. Creegan reported no such warning to any managing agent of the corporation. No written notice directly to the corporation was shown.

On December 26, 1933, there was a northeast storm of considerable intensity, accompanied by a heavy fall of snow. Late in the afternoon of that day it was noticed that the City of Bangor, which generally had a slight list to port, was listing to starboard. Within a few hours of that time the vessel sank. She still lies where she sank.

At the time the vessel sank, Capt. Ingersoll was the only representative of the company in Boston. His duties were confined to taking care of the City of Bangor and another vessel owned by the company, and at no time did he take care of any general business of the company in Boston.

Wharfage was paid at a rate of $2 a day for the period that the vessel was tied up at the wharf. Some time after she sank, a representative of the Federal Wharf Company called at the offices of the petitioner in New York and stated that in her sunken condition it would be necessary to charge at the rate of $4 a day for the City of Bangor. That sum was paid for the months of March, April, May, June, July, and August, 1934. No wharfage was paid subsequent to that time. Some time in October or November of 1934, a director's meeting of the steamship company voted to abandon the City of Bangor, but the Federal Wharf Company received no notice of their action in this respect, except that no further sums were paid as wharfage.

Since the case of Richardson v. Harmon, 222 U.S. 96, 32 S.Ct. 27, 56 L.Ed. 110, it has not been doubted that the limitation of liability statute applies well to nonmaritime torts as to those strictly within the admiralty jurisdiction. The liability to the Federal Wharf Company for the obstruction of its wharf by the City of Bangor is clearly a liability to which the limited liability acts apply. The Irving F. Ross (D.C.) 8 F.(2d) 313.

In order to be entitled to a decree limiting its liability, an owner must show that the damage was not caused by any fault of its own. Section 183, title 46, of the Code (46 U.S.C.A. § 183) provides:

"The liability of the owner of any vessel, for any embezzlement, loss, or destruction, by any person, of any property, goods, or merchandise, shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, mat-

ter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred without the privity, or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

Where the owner is a corporation, privity and knowledge of an agent which will bind the corporation as an owner must be that of some managing officer or agent of the corporation. Craig v. Continental Insurance Co., 141 U.S. 638, 12 S.Ct. 97, 35 L.Ed. 886; The Princess Sophia (C. C.A.) 61 F.(2d) 339; The South Coast (C. C.A.) 71 F.(2d) 891.

Section 183a of title 46 of the Code (46 U.S.C.A. § 183a), passed August 29, 1935, even if applicable to this case, has no bearing upon it, since there are no claims for loss of life or bodily injury. Plainly, neither Capt. Ingersoll, nor Murphy, the watchman, were managing agents of the corporation.

In so far as the sinking was caused by failure of the master or watchman to see that bulkheads or portholes were properly secured, or by the failure of the master to have the snow removed from the vessel when she was discovered to be in trouble, or by his failure to secure pumping apparatus at that time, the owner is not precluded from limitation of liability.

A more difficult problem is presented by the condition of the seams. Though the caulking was coming out of some of the seams above the water line at the time the vessel sank, it is very doubtful whether this fact alone could have caused the City of Bangor to sink in the way she did. Even if some of the seams had been open clear through to the inside of the vessel, it is improbable that enough water could have leaked through those seams which were submerged when she changed her list to have caused a vessel the size of the City of Bangor to fill and sink within a few hours.

But even if this condition of the vessel did contribute sufficiently so that it could be termed a cause of the accident, the petitioner is still entitled to a decree limiting its liability. The ship was not engaged in carrying cargo at the time, and there is no question of a warranty of seaworthiness, either express or implied, which could be considered the personal contract of the owner. The owner need only show,

therefore, that it did not know of the defect which rendered the vessel unseaworthy, and that its failure to know of that defect was not due to any fault or negligence of its own. Quinlan v. Pew (C.C. A.) 56 F. 111; The Colima (D.C.) 82 F. 665.

The managing agents of the owner were in New York. They had the vessel's hull repaired at the time they purchased her in 1929. They then put her in the hands of a competent master, whose duty it was to report to them if at any time the vessel became unseaworthy. There was nothing to show that Capt. Ingersoll ever made any such report. Mr. Ross, the vice president and general manager of the company, visited the boat himself the year before and saw nothing to indicate that there was anything wrong. Under the circumstances, it cannot be said that the company did not take all the precautions necessary on the part of the owner of a vessel which at the time was tied up at a wharf and not in active service. And as heretofore stated, the only persons connected with the company who had any knowledge of the condition of the seams were Mr. Creegan, the bookkeeper, and Capt. Ingersoll, neither of whom was a managing agent of the corporation.

Where a vessel is tied up at a wharf for storage, there is no implied promise to move her off if she sinks, nor is there a relationship of landlord and tenant between the owner of the ship and the owner of the wharf such as would place the owner under a duty to return the premises in substantially the same condition as when the vessel was first tied up. In re Highland Navigation Corporation (D. C.) 24 F.(2d) 582; The South Shore (C. C.A.) 35 F.(2d) 110.

On both of these cases it was held that where a boat sinks at a wharf under such circumstances as to entitle the owner to a limitation of liability, the owner can escape further liability by abandoning the vessel and is under no further personal contractual duty to remove the vessel.

Prior to the sinking of the vessel, wharfage at the rate of $2 a day was paid. This was as a result of an arrangement entered into by Capt. Ingersoll at the time the City of Bangor was first taken to the docks of the Federal Wharf Company. Under all the circumstances, if the

vessel had remained afloat, there may conceivably have been an implied contract to continue to pay the same rate so long as the vessel remained. But when the vessel sank, any such obligation ceased. There is no implied contract to pay wharfage when the boat is no longer utilizing the wharf. The owner's liability, if any, is to pay tort damages for the obstruction of the slip, and not a liability under an implied contract to pay wharfage. Town of Pelham v. Woolsey (D.C.) 16 F. 418; Taylor v. Atlantic Mutual Insurance Co., 37 N.Y. 275.

It is the respondent's contention that when the petitioner made payments at a new rate after the vessel was on the bottom, a new contract arose by implication to pay at that rate so long as the vessel remained where she lay. This is untenable. Any payments made to the steamship company subsequent to the sinking of the City of Bangor were obviously only temporary in character, pending a final decision on what was to be done with her. They do not give rise to a continuing contract for future payments. See Holyoke Water Power Co. v. American Writing Paper Co. (C.C.A.) 68 F.(2d) 261.

The conclusion is that the petitioner is entitled to the relief sought, and a decree to this effect may be entered.