### THE PEGEEN.

### In re KEACH et al.
### No. 6644–Y.

District Court, S. D. California,
Central Division.
April 30, 1936.

Young, Lillick, Olson, Graham & Kelly (by John C. McHose), of Los Angeles, Cal., for petitioners.

Esli L. Sutton, Rowland P. Fontana, N. B. Nelson, and R. E. Parr, all of Los Angeles, Cal., and Leslie K. Floyd, of Modesto, Cal., for claimants.

YANKWICH, District Judge.

On August 27, 1933, Russell D. Keach and Lucille Keach, his wife, were the owners of the American gasoline cruiser Pegeen, a vessel of the United States, Register No. A–1820, approximately 36 feet in length, powered with an 8-cylinder gasoline engine. The vessel was docked at Wilkie's Boat Landing, West Basin, Los Angeles Harbor. Louis R. Shaw, a licensed pilot boatman, licensed since 1931 to operate vessels up to 35 feet in length, was a friend and a former business associate of Russell D. Keach. He had his permission to use the vessel for himself and such persons as he desired to invite, whenever he chose. The owners received no compensation for such lending. Shaw also had permission to use the supplies on board. The vessel was always well supplied with gasoline and the docking charges and inspection were taken care of by the owners. The most that Shaw ever contributed was to buy gasoline when necessity arose. On Sunday, August 27, 1933, the Pegeen piloted by Shaw left her dock. There were on board eight persons, guests of Shaw. The owners were not on board. The Pegeen proceeded to the Isthmus, Santa Catalina Island, where she anchored about 10:45 a. m. After a short stop, she continued to Avalon, Santa Catalina Island, where she anchored in Avalon Bay until about 2:30 p. m., when preparations were made to begin her return voyage to Los Angeles Harbor. While the preparations were going on, an explosion occurred in the engine compartment of the Pegeen which blew the stern out of the vessel, caused other serious damage and fire on board, caused the death of one of the persons on board and injury to a number of others. Damage to and loss of clothing, baggage, personal effects, and property on board also resulted. Almost immediately after the explosion, the Pegeen started to sink. She was towed out of Avalon Bay to Pebble Beach, Santa Catalina Island, where she subsequently sank and became a constructive total loss.

The exact cause of the explosion does not appear. It is evident that it was caused by escaping gas in the hold of the ship. The gas was either propane gas escaping from a cookstove, upon which coffee had been warmed just before the explosion, or gasoline escaping from the fuel line of the motor. The ignition on the motor must have set it on fire. From the testimony of Shaw and others, the circumstances under which the explosion occurred were: Shaw first went to the bow of the vessel in order to weigh anchor, preparatory to getting under way. The vessel proceeded astern and then went ahead. The motor, at first, responded. Then the accelerator failed to respond. He then went into the hold to see the source of the trouble. He called to one of the guests to shut off the motor. The latter pushed a button, whereupon the explosion occurred. The occurrence may be well described in the words of Shaw and of E. J. Thacker, the guest who pushed the button. We quote the following from Shaw's testimony:

"Q. Then you prepared to leave at Avalon? A. Yes, sir.

"Q. Describe to the Court what took place on this boat from the time you commenced to leave. A. Well, I started the engine and I went forward to dislodge the anchor and then after the anchor had been dislodged I backed up on her, and when they let me know up in the bow that he had dislodged the anchor and had practically had it aboard, why, I started to go forward and all of a sudden, why, she would idle,—the motor would idle,—but she would not take the gas in order to give her power to meet the momentum of the seas. So there was a gas throttle on one side and a spark on the other with a wheel like a segment, you know, that have little notches in them where you can stay the

750

speed or set it by the carburation, where you can set how fast you want to go, to increase, you have to raise that lever. I threw the lever up and didn't get any response. So I stated I would have to remove the panel back of the instrument board in order to tighten the set screw, which there is a wire running from the set screw at the top down to the carburetor, in order to throw the jet open in order to get you more gas, and I figured that was the trouble. So I started down and I said to Mr. Thacker, I said, 'Well, might as well shut it off. There is no use to burn up all the gas while I am making repairs.' And I had just started down the companion way when he shut it off and, as he did so, why, she blew up."

The following is the gist of Thacker's testimony:

"Q. What operation did you go through in attempting to turn off the engine? A. There was only a switch you had—an extreme switch to the left side, only a switch was projecting out and I reached over and pushed that switch in.

"Q. And then what happened? A. That caused the explosion. * * *

"Q. In other words, when you pushed the button that explosion took place? A. That is right."

By their petition the owners seek exoneration from liability or limitation of liability. Claimants, the passengers (other than Shaw), have filed various claims for damages in various amounts. They seek to fasten liability upon the owners by alleging that the vessel was unseaworthy, her engine inadequate and not in proper mechanical condition, and that she did not have a competent master or engineer.

The question of the unseaworthiness of the vessel may be disposed of by stating that there is no evidence which would warrant such a conclusion. On the contrary, all the evidence is the other way. Not only that, but it appears, without contradiction, that the owners of the vessel kept her at a landing where she was regularly serviced and inspected, before and after each trip. Her equipment was in excellent condition. The motor was a modern, up-to-date motor which had only been installed a short time before at a considerable expense and had only had between fifty and seventy hours of running. Two weeks before the fatal trip the owners had taken her on a trip which was uneventful.

On the morning before she left her dock, the employees of the landing had inspected her and had ventilated her. They were present when Shaw started the engine and cast off. There were no defects of any type at that time. Nor was there any evidence of any odor of escaping gas of any character. Shaw's experience in seamanship and navigation stands unquestioned. His pilot's license attests them.

The claimants were Shaw's guests. All were unknown to the owners. Whether the relationship between Shaw and the owners be considered in the light of the general principles applicable to the law of bailments or in the light of admiralty principles, Shaw was *not* the agent of the owners. Nor can the owners be said to have been in control of the vessel or of its operations from the time she left her dock. The lending was clearly a gratuitous bailment. And even in the case of a bailment for hire, the bailor is not liable to third persons for the negligent acts of the bailee while the property is in his exclusive possession and control. He is liable, of course, for injuries resulting from a known defect in the property which is the subject of the bailment. See Gulzoni v. Tyler (1883) 64 Cal. 334, 30 P. 981; Rocha v. Garcia (1928) 203 Cal. 167, 263 P. 238; McClaren v. Weber Bros. Shoe Co. (C.C. A.1, 1909) 166 F. 714; Burnett v. Texas Co. (1933) 204 N.C. 460, 168 S.E. 496; Guile v. Snyder (1924) 165 Ark. 221, 263 S.W. 403; Saunders System Birmingham Co. v. Adams (1928) 217 Ala. 621, 117 So. 72; 6 Cor.Jur. p. 1151, § 114; 45 Cor.Jur. p. 894, § 335. In the case of a gratuitous bailor he is only under the duty to indicate defects in the property lent of which he is aware. He is not under the duty to inspect and repair it while it is in the possession and under the control of the bailee. If, by reason of any defect of which the owner had no knowledge, damage and injury occurs, the owner owes no obligation to the bailee on that account. Nor is his obligation to third persons greater than that to his bailee. See Johnson v. H. M. Bullard Co. (1920) 95 Conn. 251, 111 A. 70, 12 A.L.R. 766; Dickason v. Dickason (1929) 84 Mont. 52, 274 P. 145; Note on "Liability of Bailor for personal injury due to defects in subject of bailment" at 12 A.L.R. 774; and Supplementary Note on the same subject at 61 A.L.R. 1336.

Johnson v. H. M. Bullard Co., supra, is considered a leading American case on the

subject. Although the subject of the bailment was a truck, there is great similarity between the facts there and the facts here. There the defendant, a furniture dealer in New Haven, Conn., owned a Pierce-Arrow two-ton motor delivery truck which he had owned and used for about a month. One Lewis was his regular driver, and one Limbacher had charge and supervision of his trucks and of their use. On November 11th after the Armistice Day parade, Lewis used the truck for delivery of furniture for the defendant until 6 o'clock. He then put it up in the garage and went home. After changing his clothes and having his supper, Lewis called up Limbacher by telephone and asked if he could take the motortruck for the evening, as he wanted to take some people out for a ride. Limbacher gave permission to take the truck, stipulating that it should be in by 10 o'clock. Lewis and a friend started out with the truck from the garage, and after proceeding a few blocks picked up two or more friends. After driving through the streets he saw a number of young men standing at the corner. Some one upon the truck invited them to join them on the ride. By now the truck had some twelve or fifteen passengers. The truck overturned, resulting in the death of one of the passengers. The only negligence charged was the defective condition of the truck.

In determining that there was no liability, the court first defined the relationship arising between the owner of the truck and the passengers on it. It held that the relationship was that of gratuitous bailment, saying:

"The legal relationship created between the defendant and Lewis was, upon the foregoing facts, one of bailment, and was a gratuitous loan for use, the defendant being the lender and bailor, and Lewis the borrower and bailee. It was that class of bailments known in the books as commodatum.

" 'Where property is loaned gratuitously by the owner for the sole benefit, accommodation and use of the borrower, and the specific thing loaned is to be returned, a gratuitous bailment relation is created which may be called a commodate from the Roman commodatum, a similar relation.' Elliott on Contracts, § 3022.

"See Schouler on Bailments, §§ 65, 66; Dobie on Bailments, § 32. By the terms of the relationship all idea of agency is excluded, and it matters not that the bailee may at other times and for other purposes be the servant or agent of the bailor. The plaintiff's intestate, riding in the truck at the invitation, or at least the permission of Lewis, can stand in no better position than Lewis did with respect to his rights against the bailor. He is but a sharer with Lewis in the permissive use for which the truck was borrowed." Johnson v. H. M. Bullard Co., 95 Conn. 251, 111 A. 70, 72, 12 A.L. R. at page 769.

The court then discussed the duty arising from the relationship. After analyzing the leading authorities on the subject, it stated that duty as follows:

"From all this it clearly appears that the duty of the defendant to the borrower, Lewis, and so to the plaintiff's intestate, *was to disclose any defect of which it was aware which might make the loan perilous to Lewis or those whom he invited or allowed to ride with him.* The duty went no further than this, and the defendant cannot be made liable for not communicating anything it did not in fact know, whether it *ought to have known it or not.* Citing again from the Gagnon Case [69 N. H. 264, 39 A. 982, 41 L.R.A. 389, 76 Am. St.Rep. 170], the court there said: 'It would be the grossest injustice, as well as extending the law beyond any recognized principle, to subject (a defendant) to liability for defects of which he is not aware; and especially in a case like this, where the defect complained of was apparently as open to ascertainment by the plaintiff as it could possibly have been to the defendants.'

"The jury might reasonably have found that the accident was due alone to the defective condition of the two stringers by which the body was attached to the chassis of the truck, and an inadequate and insecure method of attachment which rendered the truck dangerous for the use for which it was loaned, and that therefore notice should have been given to Lewis of the defect at the time of the loan if the defendant actually knew of such defect. If the defendant itself did not have actual notice, it is not liable for failure to give notice. If, however, the defects are open and patent to the bailee, or he in fact had adequate knowledge and information of them, there is no duty to notify him, because such notice would be quite unnecessary for his protection. *The point is that the lender, though gratuitous,* must not knowingly set a trap for an innocent bor-

752

rower. Elliott, § 2999." Johnson v. H. M. Bullard Co., 95 Conn. 251, 111 A. 70, 73, 12 A.L.R. at page 771. (Italics added.)

These principles apply to all gratuitous bailments, irrespective of the character of the property which is their subject. See 3 R.C.L. 138; Gagnon v. Dana (1898) 69 N. H. 264, 39 A. 982, 41 L.R.A. 389, 76 Am. St.Rep. 170. They have been departed from in certain states, among them California, in the case of automobiles, by virtue of special enactments which make the owner of an automobile liable for death or injury to persons or property resulting from negligence in its operation by any person using or operating it with the permission, express or implied, of the owner. See California Vehicle Code 1935 (St. 1935, p. 153, § 402). Prior to the enactment of this provision, California courts required agency before holding an owner liable for injuries caused while his automobile was in the possession and under the control of another. And the presumption of agency did not even apply, as in other states, to the "family car." See Spence v. Fisher, (1920) 184 Cal. 209, 193 P. 255, 14 A.L.R. 1083.

Well-known principles of admiralty law also call for the application of these principles here.

The enactment in 1851 of the Limited Liability Act (46 U.S.C.A. § 181 et seq. and notes) did not intend to relieve the shipowner of responsibility for his own willful and negligent acts. The aim of the act was to relieve him of that imputable negligence which in the law of torts may arise out of the relationship of employer and employee, or principal and agent. He is still held liable for any violation of his duties as owner. Thus it is his duty to keep the ship and her appliances in a safe condition. See Benedict on Admiralty, 5th Ed. Vol. 1, § 475 et seq.; Hughes on Admiralty, § 166 et seq.; The Republic (C.C. A.2, 1894) 61 F. 109; In re P. Sanford Ross (C.C.A.2, 1913) 204 F. 248; The Rambler (C.C.A.2, 1923) 290 F. 791; Lord v. Goodall Steamship Co. (C.C.Cal.1877) 15 Fed.Cas. p. 884, No. 8,506. Unseaworthiness of the vessel at the time of breaking ground calls for a denial of limited liability. Cullen Fuel Co. v. Hedger (1933) 290 U.S. 82, 83, 54 S.Ct. 10, 78 L. Ed. 189; Henson v. Fidelity & Columbia Trust Co. (C.C.A.6, 1933) 68 F.(2d). 144. However, mere negligent acts or omissions upon the part even of the owner's agents

or employees in charge of the vessel are not sufficient to fasten unlimited liability under the statute. See The La Bourgogne (1908) 210 U.S. 95, 28 S.Ct. 664, 52 L.Ed. 973; The Longfellow (C.C.A.1900) 104 F. 360; The Bordentown (D.C.N.Y.1889) 40 F. 682; In re St. Louis & Tennessee River Packet Co. (D.C.Mo.1920) 266 F. 919; Pocomoke Guano Co. v. Eastern Transportation Co. (C.C.A.4, 1922) 285 F. 7; Warnken v. Moody (C.C.A.5, 1927) 22 F. (2d) 960; City of Bangor (D.C.Mass. 1936) 13 F.Supp. 648, 1936 A.M.C. 293. The cases just cited, chosen at random, illustrate the variety of circumstances under which these rules have been applied. All kinds of acts of imprudence, omission, bad seamanship, faulty navigation, and the like, have been held insufficient to throw unrestricted liability upon the owner. Even unseaworthiness does not always mean absolute liability.

In The South Coast (C.C.A.9, 1934) 71 F.(2d) 891, certiorari denied Willey v. Hobbs, Wall & Co., (1935) 293 U.S. 627, 55 S.Ct. 347, 79 L.Ed. 713, the judges of our own circuit sustained a limitation of liability, in a case involving the loss of a steamer and crew, caused supposedly by the explosion of a boiler, where it appeared that the owner had sought to conform in the matter of safety, to the requirements of the United States inspectors.

"If unseaworthiness," wrote Garrecht, C.J., "caused the loss of the South Coast, it yet must be held that such unseaworthiness existed without the privity or knowledge of the owners." The South Coast, supra, 71 F.(2d) 891, at page 895.

The basis for these decisions is found in the words "privity" or "knowledge" in the act (section 3). Limitation of liability applies to all cases of loss "incurred without the privity, or knowledge of [the] owner." 46 U.S.C.A. § 183 and note. In Lord v. Goodall Steamship Co., supra, the meaning of these words is given in a passage, which has been often quoted. Sawyer, C.J., wrote:

"As used in the statute, the meaning of the words 'privity or knowledge,' evidently, is a *personal participation of the owner in some fault, or act of negligence, causing or contributing to the loss, or some personal knowledge or means of knowledge, of which he is bound to avail himself of a contemplated loss, or of a condition of things likely to produce or contribute to the loss, without adopting*

*appropriate means to prevent it.* There must be some personal concurrence, or some fault or negligence on the part of the owner himself, or in which he personally participates, to constitute such privity, within the meaning of the act, as will exclude him from the benefit of its provisions. [Hill Mfg. Co. v. Providence & N. Y. S. S. Co.,] 113 Mass. .[495] 499, [18 Am.Rep. 527]. It is the duty of the owner, however, to provide the vessel with a competent master and a competent crew; and to see that the ship, when she sails, is in all respects seaworthy. He is bound to exercise the utmost care in these particulars—such care as the most prudent and careful men exercise in their own matters under similar circumstances; and if, by reason of any fault or neglect in these particulars, a loss occurs, it is with his privity within the meaning of the act. But the owner, under this act, is not an insurer. *If he exercises due care in the selection of the master and crew, and a loss afterward occurs from their negligence, without any knowledge or other act or concurrence on his part, he is exonerated by the statute from any liability, beyond the value of his interest in the ship and the freight pending. So, also, if the owner has exercised all proper care in making his ship seaworthy, and yet some secret defect exists, which could not be discovered by the exercise of such due care, and the loss occurs in consequence thereof,* without any further knowledge or participation on his part, he is in like manner exonerated, for it cannot be with his 'privity or knowledge,' within the meaning of the act, or in any just sense, and the provision is that 'The liability of the owner * * * for any act, matter, or thing, loss, etc., * * * occasioned without the privity or knowledge of such owner or owners, shall, in no case, exceed the amount or value of the interest of such owner in such vessel and her freight then pending.' This language is broad, and takes away the quality of warranty implied by the common law against all losses except by the act of God and the public enemy." Lord v. Goodall Steamship Co., supra, 15 Fed.Cas. 884, at page 887, No. 8,506. (Italics added.)

Actual knowledge of defects, or conditions to be remedied, or constructive knowledge, through failure to acquaint himself with conditions which it was his duty to ascertain and which were readily ascertainable, and to take necessary measures of safety, subject the owner to full liability. Kellogg & Sons v. Hicks (1932) 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903. And see The Princess Sophia (C.C.A.9, 1932) 61 F.(2d) 339.

We consider the facts in the case in the light of these principles. The loss was caused by an explosion. There is no evidence that the explosion was due to any inherent defect of the vessel or of its equipment of which the owner had knowledge. There is evidence from which an inference may be drawn that an odor of gas was detected in the hold by some of the guests and called to the attention of Shaw, after the vessel started on her voyage. He assured them that there was no danger, and that it was a leakage due to the failure to replace some defective piece of mechanism on the motor. Shaw denies this. Granted that this evidence is sufficient to show knowledge and negligence upon the part of Shaw, there is nothing to show that the owners or their agents, at the time they turned the vessel over to Shaw, knew of any such defect. The contrary, in fact, appears. An attempt was made at the trial to fasten knowledge on the owners. One of the guests, the man who pushed the button (Thacker), testified that, at the hospital to which they were all, including Shaw, taken, after the accident, he overheard a conversation between Russell Keach, who had been summoned to the place, and Shaw in which Shaw stated: "That is what we get for trying to save money." The witness stated he did not "know what they meant." Keach made no answer. Both he and Shaw deny the statement. What lends support to this denial is the fact that Shaw was seriously burned while carrying one of the women guests out of the hold. At the time of the conversation, his entire face was swathed in bandages, and he was under intense pain, unable to talk above a whisper. The statement itself is too indefinite to indicate that there was a mechanical defect of which the owners knew and which they had failed to repair. As we are dealing with a gratuitous bailment, it is to be borne in mind that the owner was under no obligation to make any repairs while the vessel was under the bailee's control. Nor, assuming that there was a duty to repair, is there any evidence of knowledge upon the part of the owner that anything needed repairing. 45 Cor. Jur. 894; and cases cited supra. On the

contrary, the seaworthiness of the vessel and the excellent mechanical condition of her equipment are shown by uncontradicted testimony.

In fact, there is nothing in the record other than the alleged admission of Shaw to show that there was any *identified* defect in the fuel line of the motor, which caused a leakage and which resulted in the explosion when preparations were being made for the return voyage. *No witness could specify what Shaw had told them the defect was.* More, the explosion might have been caused by leaking propane gas from the cook stove. And there is no evidence of any defective condition of that equipment. For all we know, one of the guests who used it just before the explosion may have forgotten to turn off the jet completely, and the escaping gas, coming in contact with the spark, may have caused the explosion. Under the circumstances, even granting that there was negligence upon the part of Shaw, the petitioners are entitled to exoneration from liability because of the absence of any evidence that the injuries were caused by any defect in the vessel or its equipment known to them or which an inspection might have disclosed.

A decree exonerating the petitioners from liability will be entered.